**In re COMMERCIAL FINANCIAL SERVICES, INC., and CF/SPC NGU, Inc., Debtors.**

**Bradley D. Sharp, Trustee of the CFS Liquidating Trust, on behalf of Commercial Financial Services, Inc., and CF/SPC NGU, Inc., Plaintiffs,**

v.

**Chase Manhattan Bank USA, N.A.; and Chase Securities, Inc., n/k/a J.P. Morgan Securities Inc., Defendants.**

**Bankruptcy Nos. 98–05162–R, 98–05166–R.**

**Adversary No. 03–0008–R.**

United States Bankruptcy Court, N.D. Oklahoma.

Sept. 14, 2005.

524

Robert M. Fishman, Larry W. Wolfson, Jay S. Geller, George J. Spathis, Richard A. Saldinger, Shaw Gussis Fishman Glantz Wolfson & Towbin, LLC, Chicago, IL, Neal Tomlins, Ronald E. Goins, Tomlins &

Goins, P.C., Tulsa, OK, for plaintiffs.

Thomas C. Rice, Mark Thompson, Linda H. Martin, Simpson, Thatcher & Bartlett, LLP, New York, NY, Frederic Dorwart, J. Michael Medina, Frederic Dorwart Lawyers, Tulsa, OK, for defendant.

## *ORDER DENYING DEFENDANTS' MOTIONS IN LIMINE TO EXCLUDE TESTIMONY OF PLAINTIFFS' EXPERT CARMEN R. EGGLESTON*

RASURE, Bankruptcy Judge.

This matter is before the Court on:

- Defendants' Motion in Limine to Exclude Testimony of Plaintiffs' Expert Carmen R. Eggleston and Memorandum of Points and Authorities in Support thereof (Doc. 112), filed by Defendants Chase Manhattan Bank USA, N.A. and Chase Securities, Inc. n/k/a J.P. Morgan Securities Inc. (collectively, "Chase") on January 31, 2005 (the "Motion")
- Plaintiffs' Response to Defendants' Motion in Limine to Exclude Testimony of Plaintiffs' Expert Carmen R. Eggleston and Memorandum of Points and Authorities in Support thereof (Doc. 116), filed by Plaintiffs Bradley D. Sharp, Trustee of the CFS Liquidating Trust, on Behalf of Commercial Financial Services, Inc. ("CFS") and CF/SPC NGU, Inc. ("NGU") (collectively, "Plaintiffs") on March 7, 2005 (the "Response to Motion")
- Defendants' Reply Brief in Support of their Motion in Limine to Exclude Testimony of Plaintiffs' Expert Carmen R. Eggleston (Doc. 135), filed by Chase on March 21, 2005 (the "Reply")
- Motion in Limine to Exclude Testimony of Plaintiffs' Expert Carmen R.

Eggleston as to the Additional Opinions and Memorandum of Law in Support thereof (Doc. 221), filed by Chase on May 23, 2005 (the "Supplemental Motion")

- Plaintiffs' Response to Defendants' Motion in Limine to Exclude Expert Carmen R. Eggleston's Supplemental Report (Doc. 234), filed by Plaintiffs on June 4, 2005 (the "Response to Supplemental Motion")
- Defendants' Reply Brief in Support of Motion in Limine to Exclude Testimony of Plaintiffs' Expert Carmen R. Eggleston as to the Additional Opinions (Doc. 250), filed by Chase on June 10, 2005

On June 14 and 15, 2005, the Court held a hearing pursuant to Rule 104(a) of the Federal Rules of Evidence to address the preliminary question of whether Carmen Eggleston's proposed expert testimony on behalf of Plaintiffs is admissible. On July 1, 2005, Plaintiffs filed Plaintiffs' Supplemental Points and Authorities Regarding Carmen Eggleston Daubert Hearing (Doc. 265), and on July 18, 2005, Chase filed Defendants' Response to Plaintiffs' Supplemental Points and Authorities Regarding Carmen Eggleston Daubert Hearing (Doc. 271) ("Response to Supplemental Points"). Upon consideration of the pleadings, briefs and exhibits attached thereto, live testimony presented at the hearing, testimony offered through affidavits and deposition transcripts, exhibits referred to at the hearing, argument of counsel and applicable law, the Court finds and concludes as follows:

Plaintiffs retained Carmen R. Eggleston ("Ms.Eggleston") to provide testimony in this fraudulent transfer action in support of their allegations that CFS was insolvent on and after December 31, 1996, and that

NGU was insolvent on October 31, 1997, and on December 31, 1997, and that CFS and NGU had unreasonably small capital as of those dates and were unable to pay debts as they came due. Chase has moved to preclude Plaintiffs from offering Ms. Eggleston as an expert witness at trial pursuant to "a straightforward application of the 'gate-keeping' principles enunciated in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579[, 113 S.Ct. 2786, 125 L.Ed.2d 469] (1993) and *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137[, 119 S.Ct. 1167, 143 L.Ed.2d 238] (1999)." Motion at 1. Chase challenges Ms. Eggleston's qualifications and methodology and contends that her key assumptions are inconsistent and not supported by the facts.

Rule 702 of the Federal Rules of Evidence provides—

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed.R.Evid. 702. Rule 703 of the Federal Rules of Evidence states—

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence in order for the opinion or inference to be admitted. Facts or data that are otherwise inadmissible shall not be disclosed to the jury by the proponent of the opinion or inference unless the court determines that their probative value in assisting the jury to evaluate the expert's opinion substantially outweighs their prejudicial effect.

Fed.R.Evid. 703.

The *Daubert/Kumho* decisions established that the trial judge must perform the "gatekeeper" function of "assess[ing] the reasoning and methodology underlying the expert's opinion, and determin[ing] whether it is ... valid and applicable to a particular set of facts" before admitting expert testimony into evidence. *Goebel v. Denver and Rio Grande Western R.R. Co.*, 215 F.3d 1083, 1087 (10th Cir. 2000). Excluding expert testimony of doubtful validity is particularly critical in jury trials, since juries may afford undue weight to the pronouncements of a witness advertised as an "expert." However, the Tenth Circuit Court of Appeals has held that "when faced with a party's objection, [the trial court] must adequately demonstrate by specific findings on the record that it has performed its duty as gatekeeper." *Id.* at 1088.[1] Because Chase has

---

**1.** The *Goebel* case concerned the failure of the trial court to act as gatekeeper in assessing the competency of an expert witness before the expert was permitted to testify before a jury. The Court has found no Tenth Circuit authority addressing whether the trial court may abandon its role as gatekeeper when a case will be tried to the bench. All published Tenth Circuit cases addressing *Daubert/Kum-* *ho* issues arise in the context of jury trials or potential jury trials. Other jurisdictions appear to soften the scrutiny of expert testimony where the possibility of unduly influencing a jury is absent. *See, e.g., Deal v. Hamilton County Bd. of Educ.*, 392 F.3d 840, 852 (6th Cir.2004) ("The 'gatekeeper' doctrine was designed to protect juries and is largely irrelevant in the context of a bench trial"); *Gibbs v.*

lodged an objection to Ms. Eggleston's testimony in advance of trial, and an extensive record has been developed, the Court is fully equipped at this point to address Chase's objections to Ms. Eggleston's competency to testify with specific findings. In *Daubert*, the Supreme Court provided guidance in performing the gatekeeping function in the form of a list of non-exclusive factors designed to assess the admissibility of scientific expert opinion evidence. These factors are principally relevant to testimony of a scientific nature, however, and are not particularly helpful in assessing the admissibility of specialized financial, accounting or valuation testimony. The *Daubert* factors include: whether the theory or technique has been or is capable of being empirically tested; whether the theory or technique has been subjected to peer review and publication; consideration of the known or potential rate of error; and whether the theory has been generally accepted in the relevant scientific community. *Daubert*, 509 U.S. at 593–94, 113 S.Ct. 2786. the Supreme Court emphasized that the inquiry is a flexible one aimed at assuring "evidentiary relevance and reliability" and that the focus "must be solely on principles and methodology, not on the conclusions that they generate." *Id.* at 594–95, 113 S.Ct. 2786. In *Kumho*, the Supreme Court explicitly held that courts possess a duty as gatekeeper to exclude any expert evidence (*i.e.*, testimony in the form of an opinion by one with specialized knowledge) that fails the tests of relevance and reliability, and that the factors used in evaluating relevance and reliability depend on the nature of the issue, the type of expertise and the scope of the testimony. *Kumho*, 526 U.S. at 141–42, 119 S.Ct. 1167.

In evaluating the admissibility of expert testimony, the Tenth Circuit Court of Appeals has provided the following guidance:

> Generally, the district court should focus on an expert's methodology rather than the conclusions it generates. *Daubert*, 509 U.S. at 595, 113 S.Ct. 2786. However, an expert's conclusions are not immune from scrutiny: "A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *General Elec. Co. v. Joiner*, 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997) ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to ad-

*Gibbs*, 210 F.3d 491, 500 (5th Cir.2000) ("Most of the safeguards provided for in *Daubert* are not as essential in a case such as this where a district judge sits as the trier of fact in place of a jury"); *Berry v. Sch. Dist. of Benton Harbor*, 195 F.Supp.2d 971, 977 n. 3 (W.D.Mich.2002) ("the court's 'gatekeeper' function under *Kumho* and *Daubert* is less critical when the court itself serves as the trier of fact"); *United States v. 100.01 Acres*, 2002 WL 923925 (W.D.Va.) at 2 ("The gatekeeping function of the court is relaxed where a bench trial is to be conducted ... because the court is better equipped than a jury to weigh the probative value of expert evidence."). *See also Technology Corp. Liquidation Trust v. Chang (In re Joy Recovery Technology Corp.)*, 286 B.R. 54, 68–69 (Bankr. N.D.Ill.2002) (recognizing that an expert witness need not be excluded for expressing a legal opinion or conclusion in a bench trial because the court is capable of sorting out testimony that will assist the court on factual issues from testimony that purports to direct a legal conclusion).

In any event, the Court, as fact-finder, will be bound by the Federal Rules of Evidence and may consider only relevant evidence and testimony of witnesses competent to testify. Whether acting as a *Daubert/Kumho* "gatekeeper" or simply applying the rules of evidence, the Court may appropriately determine the relevance of evidence and the competency of witnesses in advance of trial in order to streamline the trial (or in the case of exclusion of critical evidence, to avoid a trial altogether), and to aid the parties in assessing the strengths or weaknesses of their positions for settlement purposes.

mit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert."). Under *Daubert,* "any step that renders the analysis unreliable ... renders the expert's testimony inadmissible. This is true whether the step completely changes a reliable methodology or merely misapplies that methodology." *Mitchell [v. Gencorp, Inc.],* 165 F.3d [778,] 782 [10th Cir.1999] (*quoting In re Paoli R.R. Yard PCB Litigation,* 35 F.3d 717, 745 (3d Cir.1994)). It is critical that the district court determine "whether the evidence is genuinely scientific, as distinct from being unscientific speculation offered by a genuine scientist." *Id.* at 783 (*quoting Rosen v. Ciba–Geigy Corp.,* 78 F.3d 316, 318 (7th Cir.1996)). Regardless of the specific factors at issue, the purpose of the *Daubert* inquiry is always "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire,* 526 U.S. at 152, 119 S.Ct. 1167, 143 L.Ed.2d 238.

*Dodge v. Cotter Corp.,* 328 F.3d 1212, 1222–23 (10th Cir.2003).

 *Dodge,* like *Daubert* and other cases cited in the above-quoted excerpt, concerned scientific evidence, which relies upon the scientific methods and should be objectively testable. Experts in disciplines that require the use of professional judgment are less likely candidates for exclusion because challenges may be ultimately viewed as matters in which reasonable experts may differ in exercising their judgment as to the appropriate methodology to employ or the appropriate variable to plug into a calculation. *See, e.g., Joy Recovery Technology,* 286 B.R. at 70 ("[a]ccounting is not an exact science. Accountants are therefore required to make judgments about how to communicate financial information. A *Daubert* hearing is not the time to fully test the validity of those assumptions."). Such matters may be and should be explored and highlighted through cross-examination of the expert and presentation of contrary evidence, not at the preliminary admissibility stage. In non-scientific disciplines, assuming that the opinion addresses a factual issue of consequence to the legal regime underlying a claim or defense,[2] where the use of professional judgment may produce a broad range of acceptable opinions, so long as the expert possesses at least one of the qualifying attributes listed in Rule 702 (specialized knowledge, skill, education, experience or training), has employed a methodology recognized in the profession or by the courts, and can identify the source of the

**2.** Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R.Evid. 401. "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed.R.Evid. 403.

An expert's opinion is not relevant if it does not fit the facts or legal theory of the case. In *General Electric Co. v. Joiner,* for instance, the Supreme Court affirmed the trial court's exclusion of an expert's opinion that furans and dioxins caused lung cancer as *irrelevant* because there was no evidence that the plaintiff was exposed to furans and dioxins; thus, the opinion did not address a fact that was "of consequence to the determination of the action." *Id.,* 522 U.S. 136, 151–52, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997) (J. Stevens concurrence). However, "if the evidence raised a genuine issue of fact on the question of [the plaintiff's] exposure to furans and dioxins, ... then this basis for the ruling on admissibility [relevance] was erroneous." *Id.* at 152, 118 S.Ct. 512.

facts and data underlying the opinion (demonstrating a connection of the opinion to the facts of the case), a probing cross-examination and presentation of opposing experts and evidence will permit the fact-finder to judge the soundness of the expert's judgment, as well as the expert's credibility and potential bias, in order to assess how much weight to accord the expert's opinion. Even unpersuasive expert testimony is admissible if it is relevant (*i.e.*, it will assist the fact-finder in resolving a disputed factual issue) and is a product of a reasonable and reliable methodology.[3] *See Joy Recovery Technology*, 286 B.R. at 70 (as is often the case, dueling experts will assist the trier of fact in fully understanding an issue; thus, it is not the function of a *Daubert* hearing to exclude an expert merely because her conclusion ultimately may be rejected).

■■■ A *Daubert/Kumho* inquiry focuses upon the soundness of the *theory* espoused by the expert—is it novel or unorthodox? is it testable? do other practitioners in the discipline subscribe to it? have courts blessed it as an appropriate method? is the theory or method germane or suitable for application to the facts of the case? the inquiry should not focus on the *choice* of facts or assumptions the expert applies to the theory, although assumptions must have *some* reasonable evidentiary foundation. *See, e.g., Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir.1996) ("Although expert testimony should be excluded if it is speculative or conjectural, ... or if it is based on assumptions that are 'so unrealistic and contradictory as to suggest bad faith' or to be in essence an 'apples and oranges comparison,' ... other conten-

tions that the assumptions are unfounded 'go to the weight, not the admissibility of the testimony'") (citations omitted). Further "[a]lthough an expert opinion must be based on 'facts which enable [the expert] to express a reasonably accurate conclusion as opposed to conjecture or speculation, ... absolute certainty is not required.'" *Gomez v. Martin Marietta Corp.*, 50 F.3d 1511, 1519 (10th Cir.1995), *quoting Jones v. Otis Elevator Co.*, 861 F.2d 655, 662 (11th Cir.1988). "[W]eaknesses in the data upon which [an expert] relied go to the weight the jury should have given her opinions." *Gomez*, 50 F.3d at 1519, *citing Werth v. Makita Elec. Works, Ltd.*, 950 F.2d 643, 654 (10th Cir.1991)(other citations omitted). The fundamental purpose of conducting a trial is to allow opposing parties an opportunity to convince the fact-finder to accept their version of disputed facts; thus, one party's expert will likely assume a set of facts that the other party vehemently disputes. An expert's assumption of certain facts to the exclusion of others does not necessarily render the expert's opinion unreliable.

### A. Qualifications

■■■ The Court easily concludes that Ms. Eggleston is eminently qualified to value CFS's and NGU's assets and liabilities and to construct cash flow analyses in order to render expert opinions regarding the solvency of CFS and NGU based upon those valuations and analyses. Ms. Eggleston, a vice president of InteCap, Inc., an economic, valuation and strategy consulting firm, is a certified public accountant and certified fraud examiner with an accreditation in business valuation from the

---

**3.** Indeed, in valuing assets and debts for the purpose of determining solvency, a court may adopt all, some or none of the discrete components of either party's expert's analysis, making findings as appropriate based upon the evidentiary foundation presented. *See, e.g., WRT Creditors Liquidation Trust v. WRT Bankruptcy Liquidation Master File Defendants (In re WRT Energy Corp.)*, 282 B.R. 343, 369–70 (Bankr.W.D.La.2001).

American Institute of Certified Public Accountants ("AICPA"). Eggleston Affidavit, Plaintiffs' Exhibit ("PX") 415, at ¶¶ 1, 14–18. She has over twenty-five years of business consulting experience, as well as significant experience restructuring troubled companies, performing valuations and assessing solvency. She is president-elect and a board member of the Houston chapter of the Turnaround Management Association. *Id.* She has published articles and book chapters and has been invited to speak at national conferences on the subjects of business valuation, asset valuation, insolvency analysis, and business restructuring. *Id.* at ¶¶ 19–20. Ms. Eggleston has been retained as an expert in bankruptcy and civil litigation matters to opine on methodology, solvency, valuation, damages, and other matters similar to the issues in this proceeding. *Id.* at ¶¶ 21–28. Ms. Eggleston is recognized in her professional community as a valuation expert with special expertise in bankruptcy; she estimates that she has performed fifty to one-hundred, or more, valuations and rendered at least fifteen solvency opinions.

■■■ Chase argues that Ms. Eggleston's opinions implicate numerous subsidiary determinations that she is unqualified to make, such as predicting CFS's future personnel requirements, estimating its future expenditures, allocating resources to the collection aspect of CFS's operations, etc. Chase states such determinations would "require a deep familiarity with CFS's business or at least with the debt collection and debt buying industries to be reliable." Motion at 13. The Court finds, however, that Ms. Eggleston[4] was uniquely situated to obtain a comprehensive familiarity with the relevant facts concerning CFS's and NGU's operations and financial condition during the relevant time periods due to her employment as consultant and financial advisor to CFS's Official Committee of Unsecured Creditors and her previous employment by CFS as a consultant and expert witness in the CFS bankruptcy case and in related adversary proceedings. She has also reviewed and analyzed, for several purposes, documents produced by various parties through discovery in the CFS and NGU bankruptcy cases and related adversary proceedings, including key memos, operational and financial documents, contracts[5], appraisals, and industry analyses. She has garnered knowledge of

---

**4.** The Court recognizes that Ms. Eggleston's opinions rely in part on the work of other members or staff of InteCap, Inc., that was performed under her supervision. Consequently, the Court's references to Ms. Eggleston's research, review and analysis should be interpreted to tacitly include activities performed by others at her request, direction and control.

**5.** Chase contends that Ms. Eggleston lacks the legal expertise to interpret contracts and therefore is not qualified to assign values to CFS's and NGU's contractual assets and liabilities. Motion at 14. Ms. Eggleston consulted with CFS's general counsel to confirm her understanding of the terms of the contracts, however. In addition, accountants and appraisers routinely review and assess contracts in order to account for intangible assets and contingent or accrued liabilities. Ms. Eggle-

ston testified that it is customary for non-lawyer accountants and valuation professionals to evaluate contracts to determine their financial consequences to a business entity going forward or upon default, and that she frequently reviewed and assessed contracts for various purposes in her practice. Thus, she possesses the requisite skill and education to assess a contract from a business perspective and draw relevant financial conclusions from its terms based upon experience. An expert need not be a lawyer to draw financial (as opposed to legal) conclusions from a legal document. *See, e.g., Smith v. Ingersoll–Rand Co.,* 214 F.3d 1235, 1246 (10th Cir.2000) (it was not error to permit a forensic economist to testify as to his opinion of the meaning of the legal term "hedonic damages;" there is "no per se bar on any expert testimony which happens to touch on the law;" "[e]xpert testimony on legal issues crosses the line between

the chronology of CFS's ascendance and decline, the interrelationship between and among key events in CFS's and NGU's existence, and CFS's role in the collections industry. Ms. Eggleston interviewed key CFS personnel, attended hearings, reviewed transcripts of depositions taken in this case and in related proceedings, and generally accrued a wealth of relevant information from her long term observation of the multifaceted CFS and NGU proceedings. Eggleston Affidavit, PX 415, at ¶¶ 29–52.[6] In addition to relying upon her extensive professional experience, Ms. Eggleston also consulted and relied on authoritative texts in the valuation field.

The Court concludes that Ms. Eggleston has the specialized knowledge, skill, practical experience, training, and education necessary to undertake the complex process inherent in rendering solvency opinions in this case, and that opinions of persons with such specialized knowledge are likely to assist the Court in finding facts necessary to resolve contested issues in this proceeding. The Court further finds and concludes that Ms. Eggleston's access to information relevant to the issues in this proceeding spanned many years, that Ms. Eggleston exploited such access to the fullest extent in pursuit of her assigned task of rendering an informed opinion on solvency, and that Chase's criticism of her due diligence is unfounded.

## B. Methodology

### 1. Survey of valuation approaches and basis for choosing asset approach

The Bankruptcy Code defines "insolvent" as a "financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation." 11 U.S.C. § 101(32)(A). Consequently, it is necessary to create a "balance sheet" of an entity's assets and liabilities as of a relevant point in time in order to determine solvency in the sense contemplated by the Bankruptcy Code. In assessing the "fair valuation" of CFS's and NGU's property and debts, Ms. Eggleston chose to treat CFS and NGU as going

the permissible and impermissible when it 'attempt[s] to define the legal parameters within which the jury must exercise its fact-finding function' " (citations omitted)).

Chase, of course, shall be free to challenge Ms. Eggleston's interpretation of contract terms and her conclusions based thereon through cross-examination or with contrary evidence at trial. Further, because the trial in this case will be to the bench, the Court is well equipped to assess the accuracy of Ms. Eggleston's understanding of the legal consequences arising under the contracts and whether the contract terms actually do support the values she places on liabilities flowing from such contracts.

6. Chase falsely claims that Ms. Eggleston's opinions are based *exclusively* upon information provided by CFS general counsel Caroline Benediktson (who Chase contends is "an attorney whose experience while at CFS was completely inconsistent with many of the opinions Ms. Eggleston now offers"), and that her "wholesale reliance" on one "biased" source "is basis alone to find her testimony unreliable." Supplemental Motion at 3, 4. As is demonstrated by the lists of documents and sources appended to her expert reports, Ms. Eggleston reviewed thousands of boxes of documents containing CFS's and NGU's business and financial records, culling out for particular reliance documents reflecting circumstances reasonably contemporaneous with the valuation dates, and reviewed testimony given and documents produced by CFS's employees, lawyers, accountants, advisors, bankers, and other professionals, before offering her opinions on CFS's and NGU's solvency. There is no evidence that Ms. Eggleston simply repackaged information and opinions fed to her by Ms. Benediktson.

In addition, Chase ignores the frequent and substantial contacts between CFS senior accountant Lana Ortwein and Ms. Eggleston's staff. Deposition Testimony of Lana Ortwein, Plaintiffs' Transcript Binder, Tab 10, at 44–47, 57–62, 70.

concern entities rather than liquidating entities. Chase does not dispute that prong of Ms. Eggleston's analysis.[7]

■ Chase does contend that Ms. Eggleston failed to justify the particular valuation approach or method she utilized in applying the balance sheet test in support of her opinion that CFS and NGU were insolvent, however. Motion at 35. "Professional judgment must be used to select the approach(es) and the method(s) that best indicate the value of the business interest." NACVA [National Association of Certified Valuation Analysts] Professional Standards, PX 419, ¶ 3.6. "The approaches/methods used within a given assignment are a matter that must be determined by the business appraiser's professional judgment. The task is generally decided through consideration of the approaches/methods that are conceptually most appropriate and those for which the most reliable data is available." Business Appraisal Standards promulgated by The Institute of Business Appraisers, Inc. (Publication P–311c) (2001), Defendants' Exhibit ("DX") 484, at ¶ 1.16. "No single valuation method is universally applicable to all appraisal purposes. The context in which the appraisal is to be used is a critical factor." S. PRATT, R. REILLY & R. SCHWEIHS, VALUING A BUSINESS—THE ANALYSIS AND APPRAISAL OF CLOSELY HELD COMPANIES (4th ed. 2000) ("Pratt"), PX 396, at 27.

> There is no precise guideline or quantitative formula for selecting which approach or approaches are most applicable in a given situation.... [C]ommon factors to be considered by the analyst when selecting among alternative valuation approaches [include]—
>
> 1. The quantity and quality of the available financial and operational data.
>
> 2. The degree of the analyst's access to the available financial and operational data.
>
> 3. The supply of industry private sale transactional data.
>
> 4. The supply of industry publicly traded company data.
>
> 5. The type of business, nature of business assets, and type of industry subject to valuation.
>
> 6. The nature of the business interest subject to valuation.
>
> 7. Statutory, judicial, and administrative considerations.
>
> 8. The informational needs of the valuation audience.
>
> 9. The purpose and objective of the valuation.
>
> 10. The professional judgment, technical expertise and experienced common sense of the analyst.

Pratt, PX 396, at 439. Because the choice of approach is a matter of professional judgment upon which reasonable experts can differ, Ms. Eggleston's decision to use a particular approach to the exclusion of others, standing alone, does not render her opinion unreliable.

---

**7.** Ms. Eggleston performed a liquidation analysis in addition to an analysis of CFS and NGU going concerns in response to Chase's argument that she did not consider alternative financial strategies available to CFS and NGU. Ms. Eggleston concluded that CFS and NGU were also insolvent on the relevant dates if their assets and debts were valued under a liquidation scenario. While Chase seeks to exclude the liquidation analysis as taken under the wrong premise, valuation of CFS and NGU based on an alternative premise may be of assistance to the Court if the Court were to determine, based on the facts established at trial, that CFS and NGU should have considered liquidation as an option as of the valuation dates.

In its Motion, Chase argues that Ms. Eggleston failed "to at least consider the use of the income method or the market method to value CFS." Motion at 35. In her affidavit and at the hearing, however, Ms. Eggleston testified that she did in fact consider all valuation approaches (*i.e.*, income (discounted cash flow) approach, market or comparable sales approach, and asset approach) and gave explanations for rejecting the income and market approaches in favor of an adjusted net asset value approach. Eggleston Affidavit, PX 415, at ¶ 62.

Ms. Eggleston rejected the market approach due to the absence of sales of comparable companies during the relevant time period, citing documentary evidence to support her conclusion. *See* Ernst & Young LLP Report: Fair Market Value of Commercial Financial Services, Inc. and Related Entities as of October 28, 1996 ("E & Y Report"), PX 48, at 14470, 14474, 14478 ("no other companies have performed all the steps of purchasing, securitizing, and servicing non-performing credit card loans," "[o]ur research ... found no publicly traded companies that are substantially similar to CFS," "none [of nine potential guideline companies] is truly comparable to CFS"); Deposition of David Schiff, PX 65 (outlining the unique qualities of CFS); Arthur Andersen Client Operations Profile of CFS, PX 417 (indicates no key competitors as of December 1996).[8]

Ms. Eggleston rejected the income approach because CFS's financial statements and internal projections indicated that its negative cash flows would continue unless CFS maintained its current level of securitization activity, which she deemed unsustainable, citing an evidentiary foundation for these conclusions. *See* Eggleston Affidavit, PX 415, at ¶ 62; Temple–Bartmann Memo dated January 2, 1997, PX 42; comparison of Summary of Cash Flows, May 1, 1995 to August 31, 1996, PX 43, to Summary of Cash Flows through December 31, 1996, PX 44 (indicating decreasing cash balances during period); Chase Asset Securitization Discussion dated May 1997, PX 208 (recognizing that CFS's "overall expenses greatly exceed servicing income and require excess securitization proceeds for funding.... Distributions, expense or capital spending in excess of resources, or lack of new securitizations with sufficient excess proceeds could preclude available funds for CFS operations."). Ms. Eggleston explained that under the income approach, negative cash flows create a negative enterprise value. Therefore, the income approach would also support a conclusion that CFS was insolvent, but Ms. Eggleston considered the income approach to be a less conservative approach than the asset approach, and she believed that adopting the income approach would have subjected her opinion to criticism for "overstating the insolvency."

Consequently, Ms. Eggleston chose to utilize the adjusted net asset value ap-

---

8. Chase contends that Ms. Eggleston ignored a 1998 Goldman Sachs evaluation (which identified "peers" of CFS and their share prices). *See* Goldman Sachs Commercial Financial Services, Inc. Discussion Materials dated September 25, 1998, DX 268. Significantly, the Goldman Sachs materials did not identify the *sales of any business entities* comparable to CFS. Because Ms. Eggleston's assumptions have evidentiary support, the existence of potentially contrary evidence does not undermine the reliability of Ms. Eggleston's methodology, but rather provides fodder for fact-finding at trial. *See, e.g., Technology Corp. Liquidation Trust v. Chang (In re Joy Recovery Technology Corp.)*, 286 B.R. 54, 72 (Bankr.N.D.Ill.2002) (allegations that the expert failed to consider contrary evidence "are best suited for cross-examination").

proach.[9] In light of evidence that CFS's non-securitization revenues could not finance its existing obligation to provide collection services and was therefore likely to continue to generate losses, Ms. Eggleston cited authoritative and non-authoritative texts supporting the use of the adjusted net assets method in such a case, including R. GREEN, BUSINESS VALUATIONS, FUNDAMENTALS, TECHNIQUES AND THEORY (NACVA 1998), PX 407, at 2 ("the Adjusted Net Assets Method ... is a good method for estimating the value of a business which is *continuing to generate losses*, or which is to be liquidated"); G. NEWTON, P. SHIELDS, J. HART, BUSINESS VALUATION IN BANKRUPTCY—A NONAUTHORITATIVE GUIDE (AICAP 2002), PX 416, at 10 (the "asset-based approach usually works best with companies that have the following characteristics ... future viability of the company is doubtful").[10]

The choice of a valuation approach constitutes the exercise of professional judgment, which may be evaluated at trial in assessing the weight to accord the testimony based thereon. Chase contends that using the asset approach is an inapposite method for evaluating the solvency of CFS

and NGU because the asset approach is inconsistent with the premise of valuing the entities as going concerns. Motion at 27, n. 18. The authors of the Pratt treatise, however, distinctly dismiss this notion.

The use of the asset-based approach should not be confused with the selection of the appropriate premise of value [i.e., liquidation or going concern] for the subject business valuation. Some analysts mistakenly confuse the use of the asset-based approach with a liquidation premise of value (or with a liquidation value). Rather, the asset-based approach can be used with all premises of value—including (1) value in use as a going concern business enterprise and (2) value in exchange as part of a forced or orderly liquidation. The asset-based approach focuses on the value of the enterprise's component assets, properties, and business units. The use of the asset-based approach does not dictate the premise of value that should be applied to the enterprise's component assets, properties, and business units.

Pratt, PX 396, at 47.[11] As Plaintiffs point out, the asset approach coincides neatly

---

9. Ms. Eggleston likewise considered all three approaches before settling on the asset approach to evaluate NGU's solvency. She testified that the market approach was not feasible because NGU was a special purpose corporation lacking any operating component, that it was subject to considerable restrictions in its charter rendering it useless to a prospective purchaser, and that there existed no comparable transactions in the market on which to base a market comparable valuation. She also rejected the income approach because NGU suffered consistent losses over its lifetime; its income consisted of collections on accounts parked in NGU for the short period between acquisition and securitization of those accounts.

10. Articles cited by Chase also support the choice of the asset approach in this case. *See* Margolin, Winer & Evens LLP Newsletter,

Viewpoint on Value (September/October 2004), Exhibit B–14 to Motion, at 4 ("usually reserved for asset-intensive companies with little intangible value ..., the asset-based approach becomes increasingly important for valuing distressed companies, regardless of the nature of their operations.").

11. Consistent with Pratt's admonition that "[t]he use of the asset-based approach does not dictate the premise of value that should be applied to the enterprise's component assets," Pratt, PX 396, at 47, Ms. Eggleston separately evaluated the various approaches for the purpose of establishing a value for each component asset and liability stated on her adjusted balance sheet. For instance, for contractual liabilities that were not otherwise factored into the value of other assets or liabilities, she utilized the income (discounted cash flow) approach.

with the "balance sheet test" for insolvency envisioned by the Bankruptcy Code and cases interpreting it. Response to Motion at 26. *See, e.g., In re Taxman Clothing Co.*, 905 F.2d 166, 169–70 (7th Cir.1990).

■ Chase quibbles with almost every step of Ms. Eggleston's application of the asset approach in rendering her solvency opinions. The Court will address each element of Chase's challenge to Ms. Eggleston's methodology, keeping in mind that an analysis is not unreliable simply because one can envision a contrary conclusion if different methodological paths are taken or alternative assumptions are made. *See, e.g., Berlyn, Inc. v. Gazette Newspapers, Inc.*, 214 F.Supp.2d 530, 540–41 (D.Md.2002). Indeed, there is no single method for assessing solvency or assigning a value to assets and liabilities for the purpose of determining solvency. The Tenth Circuit Court of Appeals has stated that "the matrix within which questions of solvency and valuation exist in bankruptcy demands that there be no rigid approach taken to the subject. Because the value of property varies with time and circumstances, the finder of fact must be free to arrive at the 'fair valuation' defined in § 101(26) [now § 101(32)] by the most appropriate means." *Porter v. Yukon Nat'l Bank*, 866 F.2d 355, 357 (10th Cir. 1989). *See also Heilig–Meyers Co. v. Wachovia Bank, N.A. (In re Heilig–Meyers Co.)*, 319 B.R. 447, 468 (Bankr.E.D.Va. 2004), *aff'd* 328 B.R. 471 (E.D.Va.2005) (court applied a "totality of circumstances" test, considering and weighing the debtor's operations and financial situation (*i.e.*, debtor's history of income or loss, reported net worth, market conditions, liquidity, and availability of financing sources) in addi-tion to the adjusted balance sheet, to determine the debtor's solvency; "[a]ny appropriate means may be used to prove insolvency, and the court has broad discretion when considering evidence to support a finding of insolvency" (quotations and citations omitted)).

### 2. *Valuation of future liabilities*

■ Chase contends that "future contractual obligations—under the servicing, forward flow, and lease agreements—are [not] 'debts' within the meaning of the applicable statutes, [because] Plaintiffs were not legally bound to pay them as of the valuation dates." Motion at 17. Chase cites the Bankruptcy Code and Oklahoma Uniform Fraudulent Transfer Act definitions of "debt" and "claim" in support of its argument that future obligations under contracts are not debts. However, the Bankruptcy Code and the Oklahoma Uniform Fraudulent Transfer Act define "debt" as a "liability on a claim," 11 U.S.C. § 101(12); 24 O.S. § 113(5), and "claim" is defined as a "right to payment, whether or not [such] right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured." 11 U.S.C. § 101(5)(A); 24 O.S. § 113(3). Under these definitions, a right to payment under an enforceable contract is a debt, even if it is "unliquidated," "contingent," "unmatured," and/or "disputed." The statutory definitions do not support Chase's position that the discounted present value of future financial obligations under contracts do not constitute "debts" for the purpose of assessing solvency under the adjusted net assets approach.[12] In any event, the as-

---

12. Chase cites *Bernstein v. RJL Leasing (In re White River Corp.)*, 799 F.2d 631 (10th Cir. 1986), for the unremarkable proposition that a "debt is incurred when a debtor first be-comes legally bound to pay." Motion at 17, *quoting Bernstein*, 799 F.2d at 632. In *Bernstein*, it was necessary to determine *when* a debt for a monthly rent installment "was in-

sets and liabilities to which Ms. Eggleston must assign a value are not equivalent to "claims" against the estate, a distinction that Chase appears to ignore.[13] The valuation treatise endorsed as authoritative by both CFS and Chase supports Ms. Eggleston's view that the future financial consequences of contracts must be included as assets or liabilities when comparing assets and liabilities for the purpose of valuing a going concern. S. PRATT, R. REILLY & R. SCHWEIHS, VALUING A BUSINESS—THE ANALYSIS AND APPRAISAL OF CLOSELY HELD COMPANIES, 4th ed., PX 396. Under the heading "Contractual Agreements and Obligations," Pratt states—

> There are a variety of other contractual commitments (e.g., leases, loans, fran-

---

curred" for the purpose of determining whether *that particular payment* was preferential under the since-amended scheme of sheltering transfers made "not later than 45 days after such debt was incurred." *Bernstein* provides no guidance whatsoever to valuing liabilities on a balance sheet for the purpose of determining solvency.

Likewise, the case of *Jones v. Rowland*, 457 F.2d 44 (10th Cir.1972), cited by Chase in its Response to Supplemental Points, does not compel the Court to disregard future contractual liabilities in performing a solvency analysis. In *Jones*, the court refused to consider as an asset the debtor's potential future fees from "anticipated contracts" that were "contingent on public fundings" and under which no services had been rendered. *Id.* at 45. The Tenth Circuit held that the debtor's rights under the contracts were not sufficiently certain to ascribe any value to the contracts. *Id.* at 45–46. The court did *not* hold that future rights under existing enforceable contracts could never have value, nor did the court address whether, when valuing assets and liabilities on a *going concern* basis, the cost of a debtor's continuing obligation to perform under existing enforceable unfavorable contracts should be considered or ignored.

13. For instance, in its Response to Supplemental Points, Chase argues that "unbreached future contractual obligations do not give rise to 'debts' or 'claims' under the Bankruptcy Code," citing cases concerning the treatment of contractual claims for the purpose of *allowing the claim against the estate* or determining *the extent to which the claim is discharged*, and cases concerning the treatment of claims against the estate arising from the *assumption or rejection of executory contracts*. *Id.* at 2. These cases do not purport to define "debt" or "claim" for the purpose of balancing assets and liabilities to determine the insolvency element of a fraudulent transfer claim. Instead, they ap-

ply the rule that claims arising under executory contracts must be divided into pre-petition and post-petition parts—only the part due as of the petition date is a claim unless the contract is rejected, at which time the financial consequences of all obligations under the contract (past and future) are treated as a pre-petition claim. This scheme of isolating pre-petition debts from post-petition debts to determine which part of contractual claims may be paid from the bankruptcy estate and which part may be discharged by virtue of the bankruptcy is irrelevant to assigning a value, as of a point *prior to the bankruptcy*, to contractual assets and liabilities in order to determine the debtor's solvency as of that pre-petition date.

Chase's failure to distinguish between claims allowable against the bankruptcy estate and liabilities recognizable on a solvency balance sheet also undermines its argument that CFS's servicing liability must be valued at the amount of damages for which CFS could be liable under New York law. Response to Supplemental Points at 3. First, Chase's contention that "[s]tate law generally governs the existence and size of bankruptcy claims," *id.*, improperly equates liabilities on a balance sheet with claims against the bankruptcy estate. Moreover, measuring the servicing liability based upon damages presumes a breach of the Servicing Agreements. Ms. Eggleston did not assume that CFS breached the agreements; rather, consistent with the going concern premise that both Chase and CFS deem appropriate in this case, she assumed that CFS continued to perform servicing activities pursuant to the agreements. What New York law deems a proper remedy for a breach of the Servicing Agreements is irrelevant to the impact of CFS's expected continued performance of the Servicing Agreements on CFS's enterprise value as of the valuation date.

chise agreements, distributor agreements, customer contracts, etc.) that can have a significant impact on the value of a particular business interest. The list of potential contractual commitments is nearly infinite.... Some of the factors that should be analyzed are the time period of specific rights of ownership, restrictive covenants, transferability of commitments, favorable or unfavorable rates relative to rates available as of the valuation date, renewal options, personal guarantees, and the penalties that the company could suffer for lack of performance under these commitments.

Pratt, PX 396, at 69. Pratt also explains that when applying an asset-based approach in valuing a business, "all of the assets of the business are identified and listed on the balance sheet (note: this balance sheet is not the cost-based balance sheet that is prepared in accordance with generally accepted accounting principles), and *all of the business's liabilities are brought to current value as of the valuation date.*" *Id.* at 47 (emphasis added). Pratt provides the following example: "[I]f the company had a 6 percent bond outstanding due in 10 years, and the current market rate for a comparative bond was 8 percent, the bond would be revalued downward on the liability side of the balance sheet to a value equivalent of an 8 percent, yield to maturity bond, unless it was contemplated that the bond would be paid before maturity." *Id.* at 47. Further, "[t]he use of the asset-based approach does not dictate the premise of value that should be applied to the enterprise's component assets, properties, and business units." *Id.* Thus, it is entirely appropriate for a particular component liability, such as financial obligations flowing from a lease or contract, to be valued under the income (discounted cash flows) approach.

In connection with placing a component value on a lease, the authors of J. FISHMAN,

S. PRATT, J. GRIFFITH, PPC's GUIDE TO BUSINESS VALUATIONS, Vol. 2 (15th ed.2005) state that a lease may be listed as an asset "if the company has a favorable leasing arrangement for facilities or equipment, assuming the lease can be assigned. The general method for determining leasehold value is to compute the present value of the difference between the lease payments under the lease and a market lease payment over the remaining term of the lease agreement." *Id.*, PX 408, at ¶ 702.7. On the other hand, unfavorable long term leases should be considered a liability, and "[i]f the consultant can reasonably estimate the amount the company is likely to pay to settle such liabilities, that amount generally should be accrued, even if it is at the low end of the range." *Id.* at ¶ 702.8.

Further authority for calculating the value of leasehold interests as assets or liabilities is found in G.R. TRUGMAN, UNDERSTANDING BUSINESS VALUATION (AICPA 2d ed.), which states that the "fair market value of the lease is usually determined as the discounted present value of the future benefits to the lessee. This is the difference between the market rent and the actual rent being paid. An unfavorable lease could be a liability for the company, and if it is not treated in that manner, it will affect profitability and make the company worth less." *Id.*, PX 410, at 262.

In WORKOUTS & TURNAROUNDS II, GLOBAL RESTRUCTURING STRATEGIES FOR THE NEXT CENTURY, INSIGHTS FROM LEADING AUTHORITIES IN THE FIELD (D.DiNapoli, ed. 1999) ("Workouts & Turnarounds II"), in outlining a method for determining insolvency, which it describes as a condition in which "an entity's assets are exceeded by its liabilities at a fair valuation," the authors suggest that the analyst "[d]etermine the value of the entity's liabilities, adjusting, as appropriate, certain obligations, such as

leases, deferred revenue, and deferred tax liabilities." *Id.*, PX 409, at 357. Long term liabilities that should be valued in a solvency analysis include "unfavorable purchase commitments reduced to probable and estimable future obligations." *Id.*, PX 409, at 366. "Unfavorable purchase commitments may represent ... unfavorable supply or *service contracts*, or other contractual obligations estimated to give rise to future losses and liabilities (in the form of either payments or *performance obligations* ). Any resultant liabilities should be computed based on analysis of the terms of such commitments (*e.g.*, contracts, purchase orders) and a comparison of estimated cash inflows ... and estimated cash outflows due under the specific commitments." *Id.* (emphasis added).

Finally, with respect to including as a liability CFS's obligation to perform under various servicing agreements ("servicing liability"), Ms. Eggleston considered FINANCIAL ACCOUNTING STATEMENT 125, ACCOUNTING FOR TRANSFERS AND SERVICING OF FINANCIAL ASSETS AND EXTINGUISHMENT OF LIABILITIES ("FAS 125"), PX 330 (effective for transfers and servicing after December 31, 1996, and thus effective during periods for which solvency is at issue in this case). In Appendix D to FAS 125, the authors define "servicing liability" as "[a] contract to service financial assets under which the estimated future revenues from stated servicing fees, late charges, and other ancillary revenues are not expected to adequately compensate the servicer for performing the servicing." In paragraph 110 of Appendix B of FAS 125, the authors quote "Concepts Statement 6" as follows: "Liabilities [arising from financial assets] are probable future sacrifices of economic benefits arising from *present obligations of a particular entity to ... provide services to other entities in the future as a result of past transactions or events.*" Accounting principles adopted by Financial Accounting Standards Board *require* the recognition of a liability when estimated *future* revenues received under a contract to service financial assets are not expected to adequately compensate the servicer for the *future* servicing activities required by the contract.[14] Although

---

**14.** CFS's Chief Financial Officer understood that CFS's servicing activities resulted in a servicing liability that should be reflected on financial statements. Deposition Testimony of Mike Temple, Plaintiffs' Transcript Binder, Tab 4, April 14, 2003 transcript at 76; April 15, 2003 transcript at 357–58; November 18, 2003 transcript at 50–55. CFS also presented evidence that other companies that service financial assets report "servicing liabilities" on financial disclosures filed with the Securities and Exchange Commission. *See* MCM Capital Group Inc. Form 10K for FYE 12/31/01, PX 197, at ICI 14510–12; Charming Shoppes, Inc. Form 10K for FYE 1/31/04, PX 198, at ICI 14520 and 14523; Conseco, Inc. (as DIP) Form 10K for FYE 12/31/02, PX 199, at ICI 14530; AutoNation, Inc. Form 10K for FYE 12/31/03, PX 200, at ICI 14534.

As evidence that CFS's contractual obligation to service accounts under the Servicing Agreements indeed constituted a liability to CFS rather than an asset, Ms. Eggleston referred to (1) Chase's own recognition of CFS's servicing liability (Commercial Financial Services, Inc. Asset Securitization Discussion dated May 1997, PX 208, which states "overall expenses greatly exceed servicing income and require excess securitization proceeds for funding" and "[d]istributions, expense or capital spending in excess of resources, or lack of new securitizations with sufficient excess proceeds could preclude available funds for CFS operations"); (2) Bankers Trust's recognition of CFS's servicing liability (Bankers Trust Internal Memorandum dated November 20, 1997, PX 401, at 1, which noted Bankers Trust's vulnerability to losses if it were called on to perform as backup servicer under the Servicing Agreements because CFS reported "operating expenses (salaries and overhead) [that] were ... 7.6 times the servicing revenue"); and (3) CFS's acknowledgment of its servicing liability (Temple/Bartmann Memorandum dated January 2, 1997, PX 42 ("ser-

the law does not require compliance with generally accepted accounting principles in performing a solvency analysis,[15] FAS 125 does recognize the principle that Chase disputes, that is, that the expectation of future performance of an unfavorable servicing agreement creates a liability that decreases the present enterprise value of a business.

■ Accordingly, the Court finds that Ms. Eggleston presented justification in valuation literature and in accounting standards for including as liabilities the unfavorable portion of CFS's future lease obligation, the unfavorable financial consequences of CFS's future performance obligations under its Servicing Agreements, and CFS's and NGU's obligations to purchase accounts under forward flow agreements existing as of the date of the valuation. *See also In re Consolidated Capital Equities Corp.,* 157 B.R. 280, 282–83 (Bankr.N.D.Tex.1993) (in solvency analysis, probable liability on lease of real property was added to the balance sheet; amount of liability would be adjusted to account for potential sublease or adjusted for potential settlement with landlord (assignment to landlord of sublease rights) depending on circumstances, all discounted to present value for purposes of balance sheet test); *Nickless v. Golub (In re Worcester Quality Foods, Inc.),* 152 B.R. 394, 403 (Bankr.D.Mass.1993).[16]

vicing fees not covering operating expenses")).

**15.** *See, e.g., Official Asbestos Claimants' Committee v. Babcock & Wilcox Co. (In re Babcock & Wilcox Co.),* 274 B.R. 230, 260 and n. 237 (Bankr.E.D.La.2002), and cases cited therein ("[r]equiring application of GAAP [generally accepted accounting principles] would make accountants and the board which promulgate GAAP the arbiters of insolvency questions.").

**16.** Chase cites cases from other jurisdictions in support of its claim that "future" contractual liabilities have no place on a solvency analysis balance sheet. One case involved unasserted or speculative future tort claims, which are not analogous to obligations under existing enforceable contracts. *See, e.g., Hoffinger Industries, Inc. v. Bunch (In re Hoffinger Industries, Inc.),* 313 B.R. 812 (Bankr. E.D.Ark.2004) (although bankruptcy court struck estimated unasserted future tort claims from balance sheet in order to determine solvency, it retained as a liability the future cost to debtor to fully perform an existing construction contract); *but see Official Asbestos Claimants' Committee v. Babcock & Wilcox Co. (In re Babcock & Wilcox Co.),* 274 B.R. 230, 257–59 (Bankr.E.D.La.2002) (holding that the present value of probable unasserted future asbestos claims had to be balanced against assets to determine solvency), and *Official Committee of Asbestos Personal Injury Claimants v. Sealed Air Corp. (In re W.R. Grace),* 281 B.R. 852 (Bankr.D.Del.2002) (same). Another case involved ascribing a value of zero to an *unenforceable* debt. *See, e.g., Dery v. Cumberland Cas. & Surety Co. (In re 5900 Associates, LLC),* 317 B.R. 332 (Bankr.E.D.Mich.2004) (rejecting as a liability a claim for chapter 11 attorney fees that had never been approved by court). *See also WRT Creditors Liquidation Trust v. WRT Bankruptcy Liquidation Master File Defendants (In re WRT Energy Corp.),* 282 B.R. 343, 394–95 (Bankr.W.D.La.2001) (unenforceable parol agreement or other non-binding obligations could not be considered liabilities in solvency analysis).

In support of its contention that unfavorable contractual obligations should not be assessed against assets to determine solvency, Chase also relies on *Heilig–Meyers Co. v. Wachovia Bank, N.A. (In re Heilig–Meyers Co.),* 319 B.R. 447, 467 (Bankr.E.D.Va.2004), *aff'd* 328 B.R. 471 (E.D.Va.2005), and *Official Committee of Former Partners v. Brennan (In re Labrum & Doak, LLP),* 227 B.R. 383 (Bankr.E.D.Pa.1998). The bankruptcy court in *Heilig–Meyers* rejected, without much analysis, a valuation expert's premise that a liability in the amount of "the excess of debtors' future lease obligations with respect to certain properties over those same properties' market values" should be included in the solvency analysis. the valuation treatises supplied by Ms. Eggleston endorse such a calculation, however. the court in *Labrum & Doak* also rejected the inclusion of the sum of the debtor's entire future rent payments as a lia-

The Court recognizes that a genuine dispute exists regarding the value that should be assigned to liabilities arising from these contracts, if any. The Court concludes, however, that assigning a value to a going concern's future contractual benefits (assets) and obligations (liabilities) for inclusion on a balance sheet for the purpose of analyzing solvency has support in the relevant literature and does not constitute a methodological error that would preclude admission of Ms. Eggleston's testimony.[17]

### 3. Consideration of alternative scenarios in valuing contractual liabilities

 Chase argues that Ms. Eggleston's "fail[ure] to consider common sense steps for mitigating purported liabilities" renders her opinion unreliable. Motion at 19. With respect to her calculation of liabilities arising from contracts, Chase contends Ms. Eggleston "assumes specific performance of purportedly unfavorable contracts without considering lower-cost options such as efficient breach, mitigation, transfer, subcontracting, and renegotiation." Motion at 20. While these criticisms do not concern the reliability of Ms. Eggleston's methodology, but rather bear on the weight the Court might eventually give to particular values Ms. Eggleston assigned to certain liabilities, Ms. Eggleston testified that she did in fact consider options to mitigate the liabilities and chose the most economical alternative that was likely to occur.

With respect to the allegation that she did not consider potential sublease revenue in assessing the lease liability, Ms. Eggleston listed at least eight reasons, which need not be recounted herein, why she considered it highly unlikely that CFS would be able to sublease the superfluous space. *See* Eggleston Affidavit, PX 415, at

bility. *Accord Eerie World Entertainment, LLC v. Bergrin*, 2004 WL 2712197 at *2 n. 25 (S.D.N.Y.). However, Ms. Eggleston's analysis does not include *all future lease payments*, but limits the amount to the present value of the short-term cost of space not necessary for CFS's then-existing servicing operations (consistent with her assumption that future securitizations were not financially prudent) and the exercise of the early termination provisions of the lease. Eggleston Affidavit, PX 415, at ¶¶ 109–110; Worksheet on Present Value of Lease Agreements, PX 266. The rent expense for space used for CFS's on-going servicing activities was factored into the servicing liability. Again, Ms. Eggleston's method for calculating a liability for the unfavorable portion of the lease is supported by the accounting and valuation authorities quoted in this opinion.

**17.** Chase also faults Ms. Eggleston for including as a liability certain termination payments under some executives' employment contracts. Such potential severance obligations, payable under certain conditions that may or may not occur, are contingent liabilities and are properly considered in a solvency analysis. *See* WORKOUTS & TURNAROUNDS II, PX 409,

at 367 ("Contingencies may include potential legal liabilities, disputed claims or any other potential increase of liability or impairment of an asset dependent on the outcome of one or more future events);" "liability equals likelihood of loss (or settlement) multiplied by estimated amount of loss." *Id., citing Xonics Photochemical, Inc.*, 841 F.2d 198, 200 (7th Cir.1988); *see also Stillwater Nat'l Bank & Trust Co. v. Kirtley (In re Solomon)*, 299 B.R. 626, 639 n. 55 (10th Cir. BAP 2003). "Contingent liabilities must be limited to costs arising from foreseeable events that might occur while the debtor remains a going concern." *Travellers Int'l AG v. Trans World Airlines, Inc. (In re Trans World Airlines, Inc.)*, 134 F.3d 188, 198 (3d Cir.1998) (holding, in reviewing a solvency analysis, that contingent liabilities did not include potential liquidation expenses when the entity was a going concern on date of alleged fraudulent transfer).

The value Ms. Eggleston assigned to the termination payment contingent liability (based on her opinion as to the likelihood that the contingency would ripen into a certain liability) may be subject to dispute, but the principle of including contingent liabilities on a solvency balance sheet is not.

¶¶ 109–10. In addition, she valued the lease liability based upon the early termination provisions of the lease rather than projecting the cost of the unnecessary space over the full term of the lease.

Ms. Eggleston calculated CFS's liability on its guaranty of its affiliate's obligations under the MBNA forward flow contract (PX 300) as the present value of the difference between the price the buyer (NGU or another CFS affiliate) would be obligated to pay to the vendor and the value of the receivables it would acquire (which she estimated at eight cents on the dollar of face value). Eggleston Affidavit, PX 415, at ¶¶ 112–19. Ms. Eggleston assumed that CFS would be called upon to satisfy its guaranty of the MBNA contract because she concluded that the special purpose affiliate that was primarily liable had no assets or operations to generate revenue to perform under the contract in the future and that entering into further securitizations to generate the funds to allow the affiliate to perform the forward flow contract did not make economic sense.

 Chase argues that Ms. Eggleston should have assumed that CFS and NGU would have terminated the forward flow contracts and negotiated with the vendors to eliminate the liability entirely because,

in fact, NGU's forward flow vendors did permit NGU to terminate the contracts without liability after CFS and NGU filed bankruptcy two years later. For the purpose of a solvency analysis, however, assets and liabilities must be valued based upon information *known or knowable* as of the date of the challenged transfer. *See, e.g., WRT Creditors Liquidation Trust v. WRT Bankruptcy Liquidation Master File Defendants (In re WRT Energy Corp.),* 282 B.R. 343, 383 (Bankr.W.D.La. 2001) (writing down a performing asset to zero on account of later events that were *unanticipated and unforeseeable* as of the valuation date was improper; "use of such hindsight is inappropriate in determining value of assets at a particular point in time"); *Heilig–Meyers Co. v. Wachovia Bank, N.A. (In re Heilig–Meyers Co.),* 319 B.R. 447, 466 (Bankr.E.D.Va.2004), *aff'd* 328 B.R. 471 (E.D.Va.2005) (rejects values derived from consideration of post-bankruptcy events; courts "should ignore a decline in value of the debtors' liabilities in the hands of creditors resulting from creditors' post petition fears that debtors would not honor their debts").[18] The fact that forward flow vendors believed it was in their best interests to cease selling their credit card receivables to CFS/NGU and release CFS/NGU from their obligations

---

**18.** The Tenth Circuit recognizes that actual post-transfer events may *confirm* a value that was determined by information known or knowable at the time of the transfer, however. *See Gillman v. Scientific Research Products, Inc. (In re Mama D'Angelo, Inc.),* 55 F.3d 552, 556 (10th Cir.1995) (courts "may consider information originating subsequent to the transfer date if it tends to shed light on a fair and accurate assessment of the asset or liability as of the pertinent date. [quotation and citation omitted]. Thus, it is not improper hindsight for a court to attribute current circumstances which may be more correctly defined as current awareness or current discovery of the existence of a previous set of [knowable] circumstances."). *Accord Payne v. Clarendon Nat'l Ins. Co (In re Sunset Sales,*

*Inc.),* 220 B.R. 1005, 1016–17 (10th Cir. BAP1998) (not improper use of hindsight to value assets (as of one year prior to petition) by referring to price paid for assets in bankruptcy sales and adjusting the value upward to account for depreciation of the assets between valuation date and sale date, where debtor was deemed on its "deathbed" at the time of the transfers, justifying the use of a liquidation premise); *Official Committee of Asbestos Personal Injury Claimants v. Sealed Air Corp. (In re W.R. Grace),* 281 B.R. 852, 869 (Bankr.D.Del.2002) ("courts may consider information originating subsequent to the transfer date if it tends to shed light on a fair and accurate assessment of the asset or liability as of the pertinent date").

under the forward flow agreements *after* CFS and NGU filed for bankruptcy protection (in exchange for CFS/NGU's release of exclusivity provisions of the same agreements), due to the leverage CFS/NGU gained under the Bankruptcy Code to delay performance and to eventually reject the contracts while vendors were under pressure to sell accounts before the end of the year and while they were still fresh, in no way reflects the beliefs or motivations of the same vendors in 1996 and 1997. *See* Eggleston Affidavit, PX 415, at ¶¶ 120–22. In any event, recognizing that CFS and NGU possessed benefits and obligations under forward flow agreements and the guaranty that could increase or decrease the value a buyer might have been willing to pay for these entities as going concerns as of the valuation dates is not methodologically unsound. The quantum of the assets or liabilities arising from the contracts is in dispute; Ms. Eggleston has justified her opinion by citing evidence on which she is entitled to rely, and Chase may present opposing evidence in support of its view at trial.

Chase also argues that Ms. Eggleston failed to project that CFS would implement a turnaround plan to improve its financial position. Motion at 23. Chase contends that "[v]aluation professionals cannot merely project past performance of a troubled company into the future; rather, they must assess the business's ability to restructure itself and to correct its problems going forward." *Id.*[19] However, the author of one treatise cited by Chase warns against creating value out of thin air by forecasting a restructure or turnaround, stating "appraisals based on forecasts that depart markedly from historical patterns are suspicious. In particular, predictions of dramatic turnarounds should be viewed with skepticism.... Consequently, if a turnaround is predicted, all of the actions necessary to produce the expected success should be specified." B. CORNELL, CORPORATE VALUATION—TOOLS FOR EFFECTIVE APPRAISAL AND DECISION MAKING, Exhibit 5 to Chase's Reply, at 126.

In her analysis, Ms. Eggleston did in fact eliminate non-essential expenses, albeit the avoidance of some expenses were not without cost. For instance, Ms. Eggleston projected the cancellation of all planned lavish employee perks, such as a

---

19. Chase believes Ms. Eggleston should have modeled a turnaround strategy on the 2002 efforts of Encore Capital Group in order to pare expenses and increase revenue. Ms. Eggleston rejected the Encore model as incomparable to CFS because it was a smaller enterprise, it did not rely upon securitization advances to fund its monthly operating losses, it recorded *securitizations as financing transactions*, and it was not bound by CFS's servicing agreements or forward flow agreements. Encore also had acquired a rival, fired its management team, closed one location and downsized. In CFS's case, Ms. Eggleston believed downsizing was not an option because CFS was already understaffed to service its existing obligations. Moreover, it appears that Encore, unlike CFS, possessed residual value in the accounts it securitized, allowing Encore to eventually earn income from securitized accounts. Eggleston Affidavit, PX 415, at ¶¶ 196–97; Encore Form 10–K (2001), Exhibit 9 to Supplemental Motion. Thus, it was not unreasonable for Ms. Eggleston to reject superimposing Encore's turnaround strategy on CFS.

Chase also argues that Ms. Eggleston's methodology is flawed because she should have considered, as a "real option," that CFS "could have resolved its purported financial problems by undertaking a transaction with a partner or acquirer." Motion at 34. An opinion based upon one set of reasonable assumptions is not rendered unreliable merely because reasonable alternative assumptions might exist, however. Further, Chase's assumption that CFS was in a position to attract an acquirer is speculative at best. In fact, CFS never did attract a partner or acquirer, notwithstanding sustained efforts by Goldman Sachs and other investment banking concerns.

Bahamas cruise, a Super Bowl cruise and a trip to Disney World, but the contract terminations generated cancellation fees which she included as liabilities. Ms. Eggleston believed that CFS was incapable of greatly reducing its servicing costs (*i.e.*, by terminating personnel) without a corresponding loss in servicing revenue, and her belief that CFS already lacked sufficient collections personnel to meet the collection goals required under existing securitizations has some evidentiary support. For example, Mr. Caruso testified that even after severely paring CFS's workforce after bankruptcy in a "turnaround" attempt, servicing revenues still did not cover servicing expenses. This fact (that collection expenses exceeded revenue even after extreme cost-cutting efforts) generated the so-called Interim Agreement dispute that pitted CFS's two major constituencies— the unsecured creditors (who saw the losses incurred by continuing collection operations as eroding cash balances available to pay their claims) and the asset-backed securities holders (whose assets were being serviced)—against each other in CFS's bankruptcy case. *See, e.g.*, CFS's First Amended Disclosure Statement, PX 176, at 11424–26; Deposition Testimony of Fred Caruso, Plaintiffs' Transcript Binder, Tab 1, July 18, 2003 transcript at 42–43, and July 15, 2004 transcript at 201. *See also* Bankers Trust Internal Memorandum, PX 401 (Bankers Trust employees observed in November 1997 that "if CFS were required to reduce the resources it employs [to collect under the servicing agreements] to a level that could be supported by the servicing fees, collections would drop like a rock" and also recognized that CFS could function only because it anticipated "advance rates" from issuing future securitizations to fund its operations, and if Bankers

Trust were forced to take over servicing, it would not have the benefit of any "advance rates" and would service at a loss because contractual servicing fee did not remotely cover collection expenses); NCO Report, PX 418 (in evaluating the state of the portfolios transitioned to NCO after CFS ceased servicing, NCO concluded that the "CFS system was labor intensive and [post-bankruptcy] reductions of employees resulted in a compromise in account servicing").

In addition to projecting a leaner collections platform as an alternative to the status quo, Ms. Eggleston's hypothetical turnaround plan also eliminated future securitizations. Ms. Eggleston concluded that entering into additional securitizations, and thereby undertaking to collect millions of dollars of additional accounts, would only increase the unfavorable gap between collection expense and collection revenue, and for that reason, she determined not to project into the future the past practice of financing operations through the sales of asset-backed securities. She considered the cessation of future securitizations as a viable and economically justifiable alternative to continuing to finance operations with securization proceeds due to the increasingly burdensome servicing obligations attendant to that financing source. Although this had the effect of eliminating future securitization revenues ("advance rates"), in Ms. Eggleston's judgment, the vehicle under which CFS obtained short term operating revenue generated long term obligations to service accounts at a loss, which did not make economic sense.[20] In addition, CFS had no contractual obligation to continue sponsoring securitizations, and therefore halting securitizations after

---

20. Ms. Eggleston cites the following evidence to substantiate her opinion that ceasing securitization activity was a sound turnaround

alternative for CFS and that continuing securitization activities only increased the servicing liability (deepening CFS's insolvency): (1)

December 31, 1996, did not cost CFS anything other than the loss of future advance rates, which Ms. Eggleston believed would not offset future servicing obligations anyway. Although Chase does not agree with Ms. Eggleston's recipe for eliminating expenses and stemming losses, it cannot in good faith claim that she ignored alternative paths and "passively perpetuat[ed] the status quo." Motion at 23.[21]

### 4. Assumptions consistent with analyzing a going concern

■ Chase argues that although Ms. Eggleston claims to evaluate the solvency of CFS and NGU as if they were going concerns, Ms. Eggleston's "financial forecasts ... do not present CFS as '[a] commercial enterprise actively engaging in business with the expectation of indefinite continuance.'" Motion at 26, *quoting In re Payless Cashways, Inc.,* 290 B.R. 689, 702 (Bankr.W.D.Mo.2003). Chase contends that Ms. Eggleston's assumption that CFS stops sponsoring securitizations to raise capital and continues to service only the existing pools of accounts is not consistent with the concept of a going concern. Motion at 26.

■ Authorities indicate that the point at which an entity must be a going concern

---

cash flow reports that showed decreased cash balances between August and December 1996 notwithstanding an infusion of securitization proceeds, indicating advance rates were not sufficient to finance operations (PX 43, 44); (2) CFS's projection that advance rates would decline and disappear within 2 or 3 years (eliminating the immediate benefit of operating cash and increasing amount of loss on servicing) (E & Y Report, PX 48, at 14475); (3) CFS's Chief Financial Officer's opinion that long term placement of securitizations was unproven and that CFS's heavy reliance on advance rates that might not continue suggested the need to retain cash rather than pay off airplane debt (Vernick/Bartmann Memo dated March 28, 1997, PX 49); (4) another expert's opinion that if CFS had fully disclosed its collection problems, offerings of securitized notes would have been terminated because the notes could not have been rated or placed (Riverway Capital Partners expert report in CFS–Related Securities Fraud Litigation ("Riverway Report"), PX 169, at 4–5); (5) Arthur Andersen's opinion that upon restating the value of the residual (CFS's retained interest in the securitized receivables) to zero, the perception by investors that CFS-sponsored securitizations were overcollateralized could probably not be maintained, which would threaten CFS's ability to complete future securitizations (Arthur Andersen Internal Memo dated October 1997, PX 290, at 5); and (6) Harvard Business School case study of CFS which theorized that ratings agencies would downgrade CFS-sponsored notes if they knew that securitizations were not per-

forming as projected, which would have a negative impact on future advance rates (Harvard Business School case study, PX 242, at 9–10).

21. Chase also argues that Ms. Eggleston is wrong to make assumptions that are "contrary to actual events," and that CFS did in fact sponsor securitizations, and benefit from the advance rates, through September 1998. Motion at 37. Chase also contends, however, that Ms. Eggleston had a professional duty to "assess a business's ability to restructure itself and to correct its problems going forward," even if those events are contrary to actual events, which is what Ms. Eggleston has purported to do. Motion at 23. Chase cannot have it both ways.

In any event, there is evidence that the completion of additional securitizations between 1996 and 1998 did not improve CFS's financial prospects, and using Ms. Eggleston's methodology, projecting the revenue, expenses and increased servicing obligations of the additional securitizations would not have eliminated CFS's insolvency, but rather would have deepened it. *See, e.g.,* CFS's 1998 "State of the Union" Memo, DX 203, indicating a "decline in advance rates," projection of "cashflow [of] at least $25 million negative every quarter," "significant possibility that even if we do all of the above [cost-cutting and revenue enhancing steps and aggressive courting of ratings agencies], we could still lose financial capability and/or face continued steep declines in the advance rate."

is the date of the challenged transfer. There is no requirement that a solvency analyst choose unrealistically rosy assumptions to insure that the entity continues as a going concern into perpetuity. The decision whether to assess an entity as a going concern is legally binary: if an entity is not "on its deathbed," then, through the process of elimination, it cannot be valued using a liquidation premise, but must be valued as a going concern. *See Gillman v. Scientific Research Products, Inc. (In re Mama D'Angelo, Inc.)*, 55 F.3d 552, 555–56 (10th Cir.1995) ("Liquidation value is appropriate if at the time in question the business is so close to shutting its doors that a going concern standard is unrealistic"); *In re Taxman Clothing Co.*, 905 F.2d 166, 170 (7th Cir.1990). In many cases, a valid going concern analysis actually assumes an orderly liquidation of all assets within a reasonable time. *See, e.g., Travellers Int'l AG v. Trans World Airlines, Inc. (In re Trans World Airlines, Inc.)*, 134 F.3d 188, 193–94 (3d Cir.1998) (solvency analysis which valued debtor's assets at going concern value was proper because debtor was not on its deathbed at the time of the alleged preferential transfer, but fair value of assets of the going concern could be premised upon value that could be obtained in a hypothetical sale of assets over a reasonable time period (as opposed to an immediate liquidation)); *WRT Creditors Liquidation Trust v. WRT Bankruptcy Liquidation Master File Defendants (In re WRT Energy Corp.)*, 282 B.R. 343, 369–70 (Bankr.W.D.La.2001). In any event, it is not inconsistent to value an entity as a going concern even when its financial and operational data project continuing losses over a period of years to a point of its eventual demise.[22]

In addition, consistent with Chase's expert's admonition that a business appraiser must envision feasible alternatives to the status quo in order to maximize value, Ms. Eggleston theorized that CFS would have been more valuable in the long term without additional securitization revenues, as she believed that the long term servicing obligations arising from the securitization transactions outpaced the short term cash infusions, resulting in a deepening of CFS's insolvency with each successive securitization. Ms. Eggleston's assumption that CFS would discontinue that method of financing its operations is not inconsistent with valuing CFS as a going concern.

### 5. Assuming the value of receivables at eight cents

 Ms. Eggleston calculated NGU's liability under the forward flow agreements under the "unfavorable contract" principle applicable under the adjusted net asset value approach, which requires the recognition of a contract as a "negative asset" when its future obligations outweigh its future benefits. *See, e.g., Workouts & Turnarounds II, Global Restructuring Strategies for the Next Century, Insights from Leading Authorities in the Field* (D.DiNapoli, ed.1999), PX 409, at 366 (long term liabilities that should be valued in a solvency analysis include "unfavorable purchase commitments reduced to probable and estimable future obligations.... Unfavorable purchase commitments may represent ... unfavorable *supply* or service *contracts,* or other contractual obligations

---

**22.** Ms. Eggleston recognized that legal authorities compelled a consideration of CFS as a going concern (because it was not on its "deathbed" on December 31, 1996) even though she was of the opinion that if she assumed that CFS continued financing its operations with securitization advance rates and operated at the level it had in the past, the enormity of the continued projected losses under those circumstances would have justified the use of a liquidation premise to value the enterprise.

estimated to give rise to future losses and liabilities (in the form of either payments or performance obligations). Any resultant liabilities should be computed based on analysis of the terms of such commitments (*e.g.*, contracts, purchase orders) and a comparison of estimated cash inflows . . . and estimated cash outflows due under the specific commitments.". Ms. Eggleston assessed to NGU a liability under contracts in which NGU was obligated to purchase assets at higher prices than she believed the assets were worth; thus the liability was calculated as the difference between the contract price and eight cents (for fresh accounts) (expressed as a percentage of the contract price) times the average historical monthly cost (purchase price paid) under each contract over the term of each contract (or, in some cases, less than the term), all discounted to present value. *See* Calculation of Forward Flow Liability, PX 354 (as of 10/31/97) and PX 355 (as of 12/31/97)).

Chase criticizes Ms. Eggleston's decision to value the receivables to be purchased by NGU under the forward flow agreements (as well as the receivables owned by NGU on the valuation dates) at eight percent of their face value rather than at the rates NGU agreed to pay under each forward flow agreement. Motion at 46.[23] In reaching the conclusion that the forward flow agreements were unfavorable contracts, Ms. Eggleston relied upon several sources, including conversations with Christopher Gramlich, principal of Asset Backed Solutions, LLC, a firm retained by the Official Committee of Unsecured Creditors in the CFS bankruptcy case as its

securitization consulting expert.[24] Mr. Gramlich, who had considerable industry expertise, had analyzed the receivables generally and valued them at seven cents on the dollar. Ms. Eggleston also relied on CFS's own estimation in December 1998 (performed for the purpose of estimating the vendors' potential rejection damages and not for the purpose of this case) that the market price of receivables its affiliates were obligated to purchase under forward flow contracts that CFS had guaranteed was seven cents on the dollar. *See* CFS Summary of Guaranteed Forward Flow Contracts, PX 293. A Nilson Report dated March 1996 also reported that freshly charged-off accounts were selling at five to nine cents per dollar. The Nilson Report, March 1996, PX 285, at ICI 4250–51. An industry report authored by BT Alex. Brown dated March 2, 1998, indicated that purchase prices of fresh accounts fell into a range of eight to twelve cents per dollar. BT Alex. Brown Report, PX 284, at ICI 9055.

Ms. Eggleston chose to use the low end of the BT Alex. Brown range because she believed that CFS had bid aggressively (*i.e.*, outbid its competitors) to become the dominant purchaser in that market at that time and many industry participants expressed the opinion that CFS was overpaying for receivables and artificially inflating prices, a proposition supported by evidence in the record. *See, e.g.*, CFS Business Plan (Draft) dated October 31, 1996, PX 3, at ICI 7732 ("Competitive Analysis"); Arthur Andersen Internal Memo dated October 28, 1997, PX 290, at 4

---

**23.** If value equaled price, the contract would not be an "unfavorable contract" and it would not generate a liability.

**24.** *See* Verified Statement of Christopher J. Gramlich in Support of Application Authorizing Retention of Asset Backed Solutions, LLC as a Securitization Consulting Expert For The

Official Committee of Unsecured Creditors, Case No. 98–5162–R (Doc. 1874). Asset Backed Solutions, LLC, was "a highly specialized consulting firm concentrating on issues related only to the asset-backed securities industry." *Id.* at 2.

("Some competitors and market analysts have been skeptical as to whether CFS can achieve their projected collections [because] ... CFS pays about 20–50% more for charged-off credit card loans [than other purchasers] and CFS claims to be able to collect about 30 cents on the dollar for every loan, which is approximately double what competitors have been able to collect"). Use of hindsight tends to confirm these assumptions. *See e.g.*, Harvard Business School case study, PX 242, at 8, 25 (showing increase in price coincident with CFS's strategy to outbid other purchasers to lock up supply); Papillion Partners, Inc. Report of NGU dated April 9, 1999, PX 287, at 1, 6 ("CFS was an aggressive bidder for defaulted consumer debt (and a dominant buyer), and CFS single-handedly drove the market for such receivables to artificially high levels" and consequently "overpaid" for receivables; in addition, NGU was unable to sell its portfolio at eight to ten cents after it filed bankruptcy because "CFS and NGU had been such voracious buyers of defaulted charge accounts, that they had a heavy influence in setting the market price. The market and demand for defaulted charge accounts were seriously disrupted after CFS and NGU discontinued their purchasing activities"); Papillion Partners, Inc. Report dated January 19, 1999, PX 288, at 3 ("shortly after CFS became mired with problems, Creditrust Corporation, a competitor of CFS, reported buying charged-off credit cards at 8.5 cents on the dollar compared to the 12 cents they had seen previously .... Fresh charge-offs were bid between 7 cents and 10 cents ... around the time CFS filed for bankruptcy"); Kaulkin Report dated March 2003, PX 289, at 4 ("we watched [CFS] purchase accounts at prices we couldn't understand ... [CFS and Cre-

ditrust] served as a reminder of the need to price portfolio acquisitions correctly and of the consequences of overpaying for accounts"); Chase Recovery Optimization Initiative, PX 292, at 1 (indicated that as of 2002, "current market comfort level at 6–7 cents for charge-off and fresh paper").

While Chase may possess evidence to challenge the basis for Ms. Eggleston's assumption that the value of accounts purchased and to be purchased by NGU was eight percent of their face value, the Court cannot determine at this juncture that Ms. Eggleston's assumption so deviates from the evidence as to render her testimony on the issue of NGU's insolvency inadmissible. Another value may be more appropriate; that is an issue to be determined at trial.

*6. Basing projections on a single year of past performance*

 Chase contends that "Eggleston violates professional standards when (a) she bases her projections on only a single year of results and (b) she unreasonably assumes that the future will duplicate the recent past." Motion at 24. Chase contends that authoritative texts containing standards for performing valuation services require that projections should be based upon financial information from the immediately preceding three to five (or even ten) years. Motion at 24, n. 17.[25] Ms. Eggleston testified that projecting forward from December 31, 1996, from financials from multiple prior years was inappropriate in this case because (1) CFS radically changed its business model in 1996; (2) CFS experienced rapid growth in the year immediately preceding the valuation date which would not be captured if projections were based upon financial information from earlier periods; and (3) as of the valuation date, CFS had only recent-

**25.** This argument is inapplicable to the NGU solvency opinion, since NGU was in existence for less than a year prior to the dates for which solvency is at issue.

ly begun the trend of increasing monthly operating losses. Ms. Eggleston referred to the financial statements in CFS's Business Plan dated October 31, 1996, which indicated that assets increased from approximately $21 million as of September 1995, to $251 million as of September 1996 (PX 3 at 7739–40), and that CFS continued to grow thereafter. She therefore concluded that financial information for periods more than six months prior to the valuation date were not comparable to conditions existing as of the date of valuation, and that looking back more than six months would understate both revenue and expenditures going forward.

Chase's own citation to the Pratt treatise supports Ms. Eggleston's decision to project only from financial history that is *comparable* to what is likely to occur in the future. Pratt states—

> [P]ast history is relevant only to the extent that it may, in some cases, provide useful guidance in projecting future economic income. Nevertheless, it is not as uncommon as one might think to see "projections" which are nothing more than a statistical extrapolation of past results, with no analysis as to the extent to which the future generating forces will or will not duplicate the recent past. Usually, they will not.

Motion at 25, *quoting* Pratt at 196.[26] Ms. Eggleston did not make the mistake of

using a three to five year financial history to project CFS's likely revenues and expenses as of December 31, 1996, as Chase would have had her do. Rather, she analyzed the "extent to which the future generating forces will or will not duplicate" the three to five year period, and concluded that it was more likely that CFS's future revenues and expenses would duplicate its prior six month history, which reflected CFS's then-current business plan, rather than the prior three to five year period. Further, in her projections, Ms. Eggleston made adjustments to reflect changes she believed were likely to occur (or should occur, if reasonable economic principles were applied) with the passage of time (*i.e.*, cessation of securitization financing, leveling the hiring curve after reaching a sufficient workforce to service existing contracts, etc.).

Ms. Eggleston similarly limited her lookback periods in projecting revenue and expenses in calculating CFS's solvency on May 31, 1997, December 31, 1997, and June 30, 1998, in her Supplemental Reports because of CFS's rapid growth and rapid increase in expenditures immediately prior to those valuation periods. *See* Combined Statements of Income—December 31, 1997 and 1996, PX 6, at 2 (from January 1, 1997 to December 31, 1997, revenues increased by 167%, from $144,510,000 to $385,915,000, and expenditures in-

---

26. *See also* Pratt, Exhibit B–3 to Motion, at 62 (" the relevant *period covers the most recent* period of time immediately prior to the valuation date during which the statements represent the company's general operations. If the company significantly changed its operations a few years before the valuation date, only the previous three or four years may represent the relevant period."). CFS quotes similarly relevant excepts from other treatises in its Response to Motion at 38–39.

In addition, an article cited by Chase cautions against relying on the past five years' earnings when valuing entities experiencing

financial trouble because "distressed companies usually bear little resemblance to their former status." *See* Margolin, Winer & Evens LLP Newsletter, Viewpoint on Value (September/October 2004), Exhibit B–14 to Motion, at 1.

CFS did not begin servicing the huge portfolios of credit card receivables for securitization trusts under Servicing Agreements until 1996. Prior to that time, CFS serviced its own portfolios of receivables, including notes and judgments purchased from HUD and RTC.

creased by 230%, from $64,698,000 to $213,769,000).

The Court concludes that Ms. Eggleston's method of choosing a time period from which to project future revenues and expenses does not render her analysis unreliable.

### 7. Use of stress case collections as baseline for servicing revenue

 At the hearing, Chase argued that using CFS's stress case collection model to estimate future collection revenue, rather than assuming CFS would meet the higher base case collection goals or assuming that CFS would fail to meet even stress case collections, is an effort by Ms. Eggleston to maximize CFS's insolvency by ignoring two alternatives to the stress case scenario, both of which Chase claims would reduce the extent of CFS's servicing liability. Chase asserts that by disregarding some evidence that CFS had been meeting its base case collection goals, Ms. Eggleston is able to project lower servicing income, and that by refusing to assume that CFS would collect *below* stress case levels and thereby triggering a servicer default under the Servicing Agreements, Ms. Eggleston rules out the possibility of eliminating the servicing liability entirely (arguably due to the trustees' right under the Servicing Agreements to terminate CFS as servicer).

Ms. Eggleston explained the method she used in estimating future servicing fees and future servicing costs in her affidavit. *See* Exhibit B to Eggleston Affidavit, PX 415. At the hearing, Ms. Eggleston identified evidence from which she based her assumption that CFS could not maintain base case collections levels over the life of the securitization. This evidence included CFS's failure to meet goals on collecting defaulted accounts that were converted into performing accounts ("converted accounts"), that is, accounts in which the account obligor entered into a new agreement to pay the balance in full in installments over time. Under CFS's collections model, performance of converted accounts constituted a significant portion of projected collections in the later months of a securitization, but it appeared that actual collections on converted accounts were significantly lower than predicted. *See* Arthur Andersen Memorandum dated November 8, 1996, PX 45, at 2–3 (CFS projected that 57% of all collections would be derived from converted accounts, and CFS's base case assumed 90% success in collecting on conversions; based on limited testing, authors of memo found CFS's collection rate to be closer to 60%); Arthur Andersen Memorandum dated January 9, 1997, PX 215, at 1 ("company is collecting on conversions at a much lower pace than the base case model. Instead of collecting 90% of the agreed to monthly payments, the Company has been able to collect only 54% and 68% or approximately 60% on an overall basis. We also noted an unfavorable trend of setting up loans for lower monthly payments over longer periods of time ... [these trends] have a great effect on the overall projected cashflows in the models"). Other early indications of CFS's inability to sustain base case collections include (1) admissions by CFS executives that beginning in January 1997, meeting collection goals "seem[ed] practically impossible" (Welsh/Bartmann Memo, PX 50); (2) CFS's acceptance of lower settlements in satisfaction of accounts, and the decision to sell loans beginning in January 1997 to meet goals called for under the first two securitizations (Testimony of Charles Welsh, PX 172A, at 103–04, 115); (3) early collection reports that included revenue from "puts" (accounts repurchased by vendors), which contributed to an appearance of meeting base case goals in first few months of a securitization, and that "puts" ceased after

the sixth month (*id.* at 69–70); (4) early collection reports appearing to meet base case that included collections that ultimately had to be paid to a prior servicer (*id.*); and (5) early collection reports that appeared to meet base case that included "call—ins" that is, spontaneous payments from account debtors in response to CFS's initial letters—which enhanced collections in the first six months (*id.* at 70). Ms. Eggleston believed these factors reduced the amount of true collections by CFS, overstated the success of collections in the early months of a securitization, and revealed that the early rate of collections was not sustainable over the long term. *See also* Riverway Report, PX 169, at 8; Testimony of Charles Welsh, PX 172A, at 142.

After the first six months of servicing a pool, CFS relied on loan sales and greatly discounted settlements to achieve base or stress case results, but those tactics appeared to greatly reduce the number of loans from which to collect in later months. Welsh/Bartmann Memo, PX 50 ("fewer and fewer assets of sizable balance from which to draw the settlement funds needed to make up the monthly shortfall"); Testimony of Charles Welsh, PX 172A, at 65 ("it was challenging for us in the collection side to have a continually dwindling pool of loans with a higher [collection] goal"); Riverway Report, PX 169, at 8–9 ("sales to Cadle ... produced cash to the trusts in the current period at the expense of cash flow in future periods"). Further, base case goals were low in early months and increased in later months, but actual collection performance moved in the opposite direction (higher collections in early months, "flat" in later months). Testimony of Charles Welsh, PX 172A, at 64, 69. Ms. Eggleston considered the stress case a "conservative" basis on which to project collection revenue because even under the stress case, it was assumed that collections would exceed the principal and interest obligations to certificate holders, leaving some "residual" value in the accounts to CFS. the Court concludes that Ms. Eggleston's decision to base projected collection revenue on stress case rather than base case goals has evidentiary support and is not an unreasonable assumption.

Chase argues that Ms. Eggleston might have assumed, instead, that (1) CFS would not even meet stress case collection goals, and would therefore incur a servicer default under the Servicing Agreements, (2) the trustees of the securitization trusts would opt to terminate CFS as servicer, and (3) CFS would cease servicing altogether and thus avoid all expenses related to servicing, thus eliminating the servicing liability Ms. Eggleston projects. Termination of CFS's servicing activities, however, would not only avoid servicing expenses, but would also eliminate all servicing fees and dissolve CFS's only active enterprise. Servicing costs could be avoided only by firing a majority of CFS's employees, liquidating assets used in servicing and vacating the leased premises, activities inconsistent with the going concern premise required under the *Taxman* and *Mama D'Angelo* cases cited above.[27]

---

**27.** In response to Ms. Eggleston's testimony that cessation of servicing under the Servicing Agreements could result in an entirely different set of cashflows resulting from the breach of the Servicing Agreements, including an obligation to indemnify the backup servicer, Chase asserts that the Servicing Agreements preclude other parties from seeking damages or other remedies from CFS based upon a servicer default. Because the Court finds that assuming the termination of the Servicing Agreements is inconsistent with valuing CFS as a going concern, the Court need not interpret the Servicing Agreements to determine the probable outcome under the Servicing

Based upon CFS's historic collection curve, the atypical components that enhanced early collections of a portfolio, and CFS's own concerns about maintaining base case collections, as well as CFS's later inability to meet its base case without selling assets to an affiliate at inflated prices, Ms. Eggleston's decision to use CFS's projected stress case collections as a basis for calculating future servicing revenue (and thus servicing liability) is not so speculative or unreasonable as to preclude admission of her testimony.

### 8. Assumptions made in calculating CFS's servicing costs

Chase catalogues many complaints about Ms. Eggleston's calculation of CFS's servicing costs, generally arguing that she arbitrarily allocated greater operating costs to the servicing aspect of CFS's business than warranted. Motion at 40. Ms. Eggleston derived servicing costs from four internally prepared CFS reports. Eggleston Affidavit, PX 415, ¶ 84. She explained in extensive detail the methods she used in calculating servicing costs (as a basis for servicing liability) in her affidavit, PX 415, at ¶¶ 79–106; in her Loan Servicing Cost Analysis narrative, PX 55; in the table entitled Loan Servicing Cost Analysis–Comparison of 1996 Temple Model and InteCap Analysis of 1996 Accounts–By General Ledger Account, PX 56; and in her narrative describing her Servicing Liability Analysis—Estimated Future Servicing Costs, PX 393, at ICI 15300–10. *See also* Comparison of Servicing Liability Calculations [from 12/31/96 to 6/30/98] Using Analysis of Actuals by General Ledger Account, PX 68. With respect to estimating the number of employees needed to continue servicing existing accounts in the future (and the cost of such employees), Ms. Eggleston considered Arthur Andersen's calculation of the cost of employees needed to service existing accounts in 1996. Arthur Andersen workpapers, PX 207, at 5 (Arthur Andersen assumed a workforce of 1400 employees at a cost of $30,000 each, resulting in servicing costs of $42 million per year for personnel only). Ms. Eggleston estimated personnel costs of $38 million in the first few years of her projection, an estimate more conservative than Arthur Andersen's. She also considered the actual headcount in 1996 (PX 215, at 2) and the fact that CFS almost tripled the number of employees in 1997 (PX 219), and she analyzed employees by department to determine which employees were integral to the servicing component of CFS's business (PX 220). In addition, she considered the testimony of CFS's former human resources director, Curtis Reid, who testified from first hand knowledge regarding the allocation of employees to

---

Agreements if CFS failed to meet stress case collections and incurred a servicer default.

Chase also suggests that Ms. Eggleston might have assumed, as a turnaround strategy, that CFS would *choose* to breach its Servicing Agreements to avoid the servicing liability. The Servicing Agreements did not permit CFS to voluntarily resign as servicer, and a breach of the Servicing Agreements may not have necessarily triggered relief from the servicing liability, in any event, because replacement of CFS by another servicer was *at the discretion* of trustees/noteholders. Servicing Agreement, PX 55, at ¶¶ 4.4, 8.2. The Court notes that until CFS's eventu-

al liquidation, the securitization trustees in fact did require CFS to continue servicing the securitizations (in the face of loud opposition from the unsecured creditors) notwithstanding the trustees' knowledge that CFS had already breached the Servicing Agreements by resorting to impermissible asset sales to an affiliate to meet collection goals. In any event, the assumption that CFS would unilaterally choose to cease servicing the securitizations would again leave CFS without a business and propel the analysis into liquidation territory, which is inconsistent with the going concern premise both parties advocate.

the collection function of CFS. Deposition Testimony of Curtis Reid, Plaintiffs' Transcript Binder, Tab 11, at 36, 42–44, 63, 86–98, 109–116, 145. Mr. Reid also testified that he believes Ms. Eggleston's allocation of employee costs to CFS's collection function is conservative.

To validate her projections from these assumptions, Ms. Eggleston examined actual servicing expenses as a percentage of actual servicing fees during later years, as well as post-bankruptcy events, both of which confirmed that servicing fees were inadequate to cover servicing expenses.

Chase may believe that other evidence supports a different allocation of resources which compels a different result, but there is no evidence that Ms. Eggleston's consideration of historic employment data, historic costs, and business trends and expectations, and extrapolating future expenses based on such data, is methodologically unsound.[28] The Court, as trier of fact, will be tasked at trial with reconciling potentially conflicting evidence to ascertain what weight to accord Ms. Eggleston's resource allocation, which drives her calculation of future servicing costs and ultimately her valuation of the servicing liability.

### 9. Choice of discount rate

In placing a present value on CFS's servicing liability, forward flow liability and lease liability, Ms. Eggleston used a discount rate of approximately eight percent, and in valuing NGU's forward flow liabilities, she applied a discount rate of approximately seven and one-half percent. Chase contends that Ms. Eggleston uses "an incorrect and unsupported methodology to obtain an artificially low discount rate to estimate the present values of the purported servicing, forward flow, and lease liabilities." Motion at 30. Chase contends that instead of using a well-established method for computing a discount rate, such as the Weighted Average Cost of Capital (WACC) or Capital Asset Pricing Model (CAPM), Ms. Eggleston adopted as a rate for discounting all liabilities the interest rates on the latest issued asset-backed certificates, which received single-A ratings by the ratings agencies and were therefore considered to be relatively safe investments.

In seeking to discredit Ms. Eggleston's decision to apply the certificate interest

---

**28.** Chase also argues that FAS 125 requires recognition of a servicing liability when compensation received from servicing is "below the rate of compensation that would be demanded 'by a new or outside servicer'" and therefore Ms. Eggleston errs when she calculates the servicing liability as the difference between servicing fees and its costs of servicing rather than the difference between what CFS charged for servicing and what others in the market charged for servicing. Reply at 14–15. However, FAS 125 accounting principles may not fairly reflect CFS's future liability in performing the Servicing Agreements in this case because (1) under the agreements, CFS was not entitled to resign from servicing so long as it continued in business and it could not assign its obligations under the agreements without the consent of the trustees, and (2) comparing CFS's servicing fees to those of a "new or outside servicer" would

not reflect the actual costs CFS would likely incur in performing under the agreements. While GAAP may require that a servicing liability be calculated using a market approach for the purpose of reporting the liability on financial statements, a variety of approaches are available to evaluate future contractual liabilities to determine whether an entity is solvent. See, e.g., Official Asbestos Claimants' Committee v. Babcock & Wilcox Co. (In re Babcock & Wilcox Co.), 274 B.R. 230, 260 and n. 237 (Bankr.E.D.La.2002), and cases cited therein (GAAP does not set the standard for valuing assets to determine solvency). In this case, using the market approach to evaluate CFS's servicing liability may distort economic reality by ignoring the restrictions placed on CFS's options to mitigate future losses resulting from its obligations under the Servicing Agreements.

rate to the liability streams, Chase identifies higher discount rates adopted by other analysts valuing certain assets of CFS. Motion at 31. For instance, in February 1997, Arthur Andersen used a 15% discount rate to value a stream of collection revenue, which Andersen "deemed to be an appropriate interest rate commensurate with the risk of the transaction to reflect the estimated present value of the receivables." Arthur Andersen Memo re Residual Testing Approach, PX 45, at 1.[29] In her analysis, however, the risk inherent in collecting receivables is not at issue; rather Ms. Eggleston is assessing the probability that the particular future liabilities will exist.

The principles underlying conventional "discount rates"—those calculated under one of the formulas Chase advocates—are incompatible to "discounting" the future stream of a debtor's payments on a contractual liability to present value. A discount rate is defined as an "opportunity cost," that is, the "expected rate of return (or yield) that an investor would have to give up by investing in the subject investment—instead of available alternative investments that are comparable in terms of risk and other investment characteristics." Pratt, PX 396, at 159. Conventional formulas for calculating a discount rate on future earnings assume some benefit to a hypothetical buyer or investor; in discounting liabilities, the very premise underlying the formulas is absent. No one would forego the opportunity to purchase an investment that might yield a benefit in exchange for the right to satisfy future payments on CFS's or NGU's contractual obligations. In real economic terms, the function of applying a "discount rate" to a stream of future outflows (liabilities) is similar to choosing a probability or risk factor when valuing a contingent liability. *See, e.g., In re Xonics Photochemical, Inc.*, 841 F.2d 198, 200 (7th Cir.1988) ("[t]o value a contingent liability it is necessary to discount it by the probability that the contingency will occur and the liability will become real").

Ms. Eggleston stated that because of the *certainty* that CFS would incur obligations under the Servicing Agreements, the forward flow agreement guaranty and lease, the related streams of negative cash flows are not risky or improbable cash flows and therefore a lower "discount rate" is appropriate. Her assessment of the probability that the expenses would be incurred is not unreasonable; there is no evidence that any of the contracts from which the liabilities flow were not fully enforceable. CFS's servicing liability was fairly likely to occur because CFS's duty to continue to

29. Other discount rates associated with prior valuations of CFS were cited by Chase as more appropriate than Ms. Eggleston's certificate rate, but like the Arthur Andersen analysis, the cash flows being discounted were for the entire enterprise, not outflows associated with a discrete contract. *See, e.g.,* E & Y Report, PX 48, at 14477 (applied fifteen percent discount rate (using CAPM) to value CFS as an entity under income approach). Further, the discount rates assigned by the authors of the Riverway Capital Report and Papillion Report to value the CFS-sponsored asset-backed securities *after* CFS filed bankruptcy (*e.g.,* 15–35%) are inapplicable to determining the present value of CFS's future contractual liabilities as of December 31, 1996, for reasons too obvious and numerous to list. Chase also attempts to compare Ms. Eggleston's discount rate unfavorably to the 45% discount rate chosen by Encore Capital Group, Inc. to value its highly speculative retained interest in securitized receivables, an asset comparable to CFS's "residual" (the present value of collections on receivables after full payment of principal and interest to the noteholders (and all related fees)). Again, the two streams of cash (Encore's doubtful future inflows and CFS's nearly certain outflows) are so dissimilar that their comparison is meaningless. *See also* Eggleston Affidavit, PX 415, at ¶ 200.

perform servicing functions under the Servicing Agreements was not assignable, and CFS was not permitted to resign as servicer without consent of all parties to the agreement, including the securitization trustees and the back-up servicer. Servicing Agreement, PX 55, at ¶ 4.4. Further, prior to discounting the lease liability to present value, Ms. Eggleston substantially reduced the amount of the future payments on the superfluous space by assuming the exercise of the early termination provisions. Finally, with respect to CFS's guaranty of the MBNA forward flow liability, Ms. Eggleston believed it was inevitable that CFS would be called upon to satisfy its affiliate's future obligations because (1) the affiliates' obligation to pay for receivables under forward flow agreements had historically been satisfied with advance rate revenue, which ceased under Ms. Eggleston's assumptions, and (2) CFS's affiliates did not operate and lacked revenue from which they could pay their own debts.

 Further, in performing a solvency analysis, liabilities must be valued from the perspective of the debtor, not from the perspective of the hypothetical investor assumed by the discount rate formulas, nor from the perspective of the creditor to whom the obligation is owed. *See Covey v. Commercial Nat'l Bank*, 960 F.2d 657, 660–61 (7th Cir.1992) (for purposes of solvency analysis, debtor's liability arising from guarantee of parent's note should not be reduced to the maximum amount the creditor could expect to realize from debt-

or's assets, since that reduction would result in liabilities equaling assets, and therefore insuring a finding of solvency even in cases where the debt guaranteed exceeded debtor's assets). From CFS's perspective, the future liabilities arose from obligations under enforceable contracts; CFS would not be able to *reduce* those obligations based upon its average cost of capital, its comparison to other companies, or the health of its industry, for example, so it does not make sense that the present value of those liabilities would be reduced according to the types of factors that drive the discount rate formulas applied to net cash flows when valuing business entities.[30]

Because Ms. Eggleston's choice of discount rate has a reasonable basis in law and logic and the record tends to support her assessment of the probability that CFS would incur the expenses underlying the discounted liabilities, there is no basis to exclude her proposed testimony as unsound or unreliable.

### 10. Sensitivity analysis

 Chase argues that failing to conduct a sensitivity analysis to test the effect of varying some of Ms. Eggleston's key assumptions "violates valuation practices and standards." Motion at 34. In support, Chase cites AICPA's Draft Statement of Standards for Valuation Services No. 1 (2002) ("Draft Statement"), which suggests the consideration of a sensitivity analysis, which is described in the Draft Statement as "a summary of the effect on

---

**30.** For example, a high discount rate might be appropriate if one was valuing CFS's landlord's contractual right to receive future rents *from CFS*. If CFS's financial condition and industry status were precarious, it would make sense to severely discount the future cash flows expected from CFS. From CFS's perspective, however, its *obligation* to make future payments is not diminished by its own

enterprise risk factors, and the present value of its future liability should reflect the probability that it will continue to be obligated under the lease. As the Seventh Circuit held in *Covey*, the debtor's *ability* to satisfy its debts is not a factor in determining the amount of a debt in measuring solvency. *Covey*, 960 F.2d at 660–61.

discounted cash flow results from varying key assumptions (such as the discount rate, commodity pricing and/or major operating assumptions)" when performing a valuation using the discounted cash flow method. *Id.*, Exhibit B–4 to Motion, at ¶ 2.23.1(b)(iv). Ms. Eggleston states (and Chase does not refute) that the Draft Statement was widely criticized and was withdrawn and that no replacement draft was in circulation at the time of her reports. Eggleston Affidavit, PX 415, at ¶ 201.

Chase also relies on THE HANDBOOK OF ADVANCED BUSINESS VALUATION, which states "in order to make a determination as to whether a company has adequate capital and is likely to be able to pay its debts as they come due, one should examine the company's financial performance under a range of possible performance scenarios." *Id.*, Exhibit B–22 to Motion, at 347. Also, in an article in Viewpoints on Value, the authors suggest using sensitivity analyses to "help valuators and managers isolate distressed companies' key value drivers." *Id.*, Exhibit B–15 to Motion, at 4. These excerpts do not convince the Court that conducting a sensitivity analysis to identify "key value drivers" is mandatory (or even necessary) to a sound solvency analysis.

Common sense indicates that when performing calculations involving large numbers, changes in variables like discount rates, prices of charged off loans, and cost allocations will shift the final result of the calculation in one direction or the other. A more relevant concern is whether Ms.

Eggleston is able to articulate a reasonable basis in fact for choosing a particular variable, not whether changing the variable may alter the result (it always will). Ms. Eggleston explained her reasons for selecting a relatively safe discount rate for discounting liabilities, expressed in excruciating detail all the reasons she chose to include or exclude certain income streams or expenses (account by account) in her calculation of CFS's servicing liability, and identified some evidence to support her decision to value purchased receivables at eight percent of their face value. Even if Ms. Eggleston performed sensitivity analyses on those variables, as suggested (and performed) by Chase's expert, Chase does not explain how that analysis could alter the facts on which Ms. Eggleston relied when selecting the particular variables or demonstrate that Ms. Eggleston's assumptions are *per se* unreasonable.

### 11. Analysis of cash flows

Chase alleges that Ms. Eggleston's analysis of CFS's cash flows for the purpose of testing CFS's ability to pay debts [31] and its adequacy of capital [32] is unsound because she fails to (1) add depreciation back to net income; (2) subtract capital expenditures from net income; and (3) add back reductions in working capital. Motion at 27. In addition, Chase contends that since Ms. Eggleston assumed that CFS would not continue sponsoring securitizations as a financing tool, she should have deducted expenses related to securiti-

---

31. A party satisfies the ability to pay debts test (as an alternative to establishing balance sheet insolvency) by proving that the debtor "voluntarily or involuntarily ... intended to incur, or believed that the debtor would incur, debts that would be beyond the ability of the debtor's ability to pay as such debts matured." 11 U.S.C. § 548(a)(1)(B)(ii)(III).

32. A party satisfies the adequacy of capital test (as an alternative to establishing balance sheet insolvency) by proving that the debtor "voluntarily or involuntarily ... was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an [sic] unreasonably small capital." 11 U.S.C. § 548(a)(1)(B)(ii)(II).

zations in calculating cash flows. Motion at 29.

Ms. Eggleston described the methodology she adopted to analyze CFS's ability to pay debts and adequacy of capital as of December 31, 1996, as follows: She "utilized a projection of CFS's cash flow from operations for 1997. The projection of cash flow from operations was based on CFS's actual income and expenses for 1996, adjusted to exclude the net income related to the securitizations in 1996." Eggleston Affidavit, PX 415, ¶ 134. In justifying her decision not to add back depreciation and subtract capital expenditures, Ms. Eggleston stated that she "conservatively retained CFS's depreciation expense for 1996 in lieu of projecting capital expenditures. This depreciation expense was significantly less than CFS's anticipated capital expenditures, and, thus, would not have overstated the amount of required monthly expenditures." Eggleston Affidavit, PX 415, at ¶ 139. Ms. Eggleston's assumptions as to the comparative levels of capital expenditures and depreciation are supported by cash flow reports for 1996 and 1997 which indicate capital expenditures of approximately $34.7 million and $39 million, respectively, compared to depreciation expense of approximately $4 million and $8 million, respectively. Combined Financial Statements, PX 6, at ICI 07642–43. The Court finds that estimating CFS's future capital expenditures as equal to the prior year's depreciation is a conservative position that overstates rather than understates CFS's available cash.[33]

With respect to Chase's contention that she failed to adjust for changes in working capital, Ms. Eggleston explained that she projected 1997 operations as equal to 1996 operations and projected monthly totals to be one-twelfth of the annual totals, and therefore, based upon her assumptions, no adjustments were necessary. Eggleston Affidavit, PX 415, at ¶¶ 140, 198. Despite faulting Ms. Eggleston for failing to adjust for changes in working capital, Chase has not provided any evidence that adjustments to working capital were necessary or appropriate in this case, or proposed adjustments that should have been made or illustrated the effect such adjustments would have on Ms. Eggleston's analysis or conclusions. Thus, the Court cannot conclude that Ms. Eggleston's decision to project consistent working capital renders her opinion unreliable. The weight the Court decides to accord that element of Ms. Eggleston's analysis will be determined at trial.

Securitization advance rates were eliminated from Ms. Eggleston's projected cash flows because she "did not think it was appropriate to forecast a transaction that is fixing or providing short term cash that will in fact increase the amount of insolvency." Chase argues that CFS did, in fact, pay its debts as they came due with new securitization proceeds, but Ms. Eggleston counters that the additional securitizations only worsened CFS's financial position by increasing the magnitude of its servicing obligation. In projecting the 1997 cash flows, Ms. Eggleston did not reduce actual 1996 expenses to exclude expenses related to the securitizations that closed in 1996, but she believed that such expenses were not material, and Chase has not articulated any material expenses that

---

**33.** Contradicting its stance that Ms. Eggleston should have subtracted from net income (and thus added to expenses) at least $34 million of capital expenditures in her cash flow analysis, Chase also suggests that Ms. Eggleston should have eliminated from projected expenses even the paltry $4 million of capital expenditures that she allowed, because she projects CFS to "go out of business" in seven to eight months, which would render capital expenditures useless. Transcript at 213.

should have been backed out of the expense side of the 1997 cash flow projection. Again, these issues arise from the exercise of professional judgment and are more appropriately litigated at trial.

With respect to NGU, Chase argues that Ms. Eggleston failed to consider NGU's future collection revenue in the cash flow projection. *See* Projection of Cash Flow as of October 31, 1997, PX 116 (comparing future obligations under forward flow contracts with funding from financing sources only); Projection of Cash Flow as of December 31, 1997, PX 119 (same). Ms. Eggleston contends, with some evidentiary support, that NGU's collection revenue was more than offset by NGU's operating expenses, servicing fees and interest owed on the warehouse line and CFS loans, all of which she also omitted. *See* NGU Income Statement as of October 31, 1997, PX 99, at ICI 10279 (showing collection revenue of $501,922.54 versus servicing fees of $125,479.89, operating expenses of $395,787.24, and interest expense of $902,911.86); NGU Income Statement as of December 31, 1997, PX 100, at ICI 10240 (showing collection revenue of $1,522,120.01 versus servicing fees of $358,172.03, operating expenses of $396,296.24, and interest expense of $1,467,250.55). Including future collection income, operating expenses, servicing fees and interest would have only hastened NGU's demise under Ms. Eggleston's analysis. Again, her cash flow projections apply a more conservative model.

Finally, the treatises cited by Chase in support of its claim that Ms. Eggleston's cash flow projections "have been created using a unique methodology that violates well-established professional standards,"

Motion at 28, do not support that proposition. The Court has not been provided with "well-established professional standards" for determining the inability to pay debts as they mature or inadequacy of capital under Section 548 of the Bankruptcy Code.

### 12. Corrections to calculations and revisions of reports

 Ms. Eggleston's efforts to revise her reports and calculations do not necessarily render her methods or opinions unreliable. In her affidavit, Ms. Eggleston explained in great detail the reasons for revising her calculations and supplementing her reports. Eggleston Affidavit, PX 415, at ¶¶ 174–190.[34] The Court notes that rendering solvency opinions in this case was a complex undertaking, requiring Ms. Eggleston to locate and digest a deluge of financial and operational data relevant to CFS's and NGU's circumstances as of the relevant dates, to determine the existence of and assign values to somewhat unique assets and liabilities, and to consider and implement different valuation approaches under various possible scenarios. None of the revised calculations cast doubt on Ms. Eggleston's qualifications or skills; rather, the Court is impressed with Ms. Eggleston's diligence in seeking to insure that her opinion is based upon demonstrable facts (some of which were overlooked in prior reports or only came to light after the reports were issued)[35] that her reports are internally consistent and consistent with each other, and that her analysis can withstand a rigorous review. Further, some of the amendments had no effect on

---

**34.** At the hearing, Ms. Eggleston corrected a transposition of the words "assets" and "liabilities" in paragraphs 176, 179, 183 of her affidavit.

**35.** *See* Eggleston Affidavit, PX 415, at ¶ 180.

the value of an asset or liability[36] and many of the revisions ultimately decreased the degree of insolvency.[37] Consequently, the corrections are not of the type to cause suspicion that Ms. Eggleston was influenced by the need to reach a particular result for the purpose of this litigation. *See, e.g., Ed Peters Jewelry Co. v. C & J Jewelry Co.*, 124 F.3d 252 (1st Cir.1997) (court found that extra scrutiny of plaintiff's expert's methods was warranted after the expert revised his business valuation upward by $2.5 million in response to a motion for summary judgment that indicated that original valuation did not exceed debt owed to foreclosing bank and therefore did not support plaintiff's claim).

Chase also asserts that Ms. Eggleston's decision to include a liquidation analysis in her supplemental report implies that she vacillated in her methodology. She testified, however, that she persisted in her opinion that a going concern premise was appropriate, but performed a liquidation premise solvency analysis only at the request of counsel to address Chase's suggestion that she should have considered alternative strategies that would not result in a projection of continued operational losses. Chase's expert, Professor Gilson, cited a treatise that included "abandonment" of the enterprise as an option. *See* R. BREALEY AND S. MYERS, PRINCIPLES OF CORPORATE FINANCE, Exhibit 3 to Response to Supplemental Motion. By including the liquidation analysis, Ms. Eggleston did not intend to replace her going concern analysis, but simply desired to show that using an alternative premise would not alter her opinion that CFS was insolvent as of December 31, 1996. Eggleston Affidavit, PX 415, at ¶ 187.

The Federal Rules of Civil Procedure anticipate that an expert may have to correct or supplement her reports or amend her deposition testimony. Fed. R.Civ.P. 26(e) (applicable in this proceeding by virtue of Bankruptcy Rule 7026). Unexplainable or unjustifiable revisions to reports, calculations or opinions may warrant caution in evaluating the reliability of the expert's work, but when mistakes are made, caught, corrected and *satisfactorily* explained by the expert in a supplemental report, as required by the Rule 26(e), no adverse inference as to the reliability of the expert's opinion need be drawn. The Court declines to drawn an adverse inference about the quality of Ms. Eggleston's work product, as the Court finds that in an effort to provide complete and accurate disclosures, Ms. Eggleston has satisfactorily explained the cause of mathematical errors and the basis for revising certain calculations through proper and timely supplementation. None of the corrections, revisions or supplementations altered Ms. Eggleston's ultimate opinion that CFS and NGU were insolvent on the relevant dates.

## C. *Conclusion*

The Court concludes that Ms. Eggleston is qualified by education, training, skill and experience to render an opinion on the solvency of CFS and NGU at particular points in time, that she used recognized and logical methods to value assets and liabilities in order to apply the balance sheet test that is the hallmark of a solvency analysis under applicable law, that her underlying economic assumptions have some evidentiary foundation and are not unrealistic or unreasonable in light of the evidence relied upon, and that her conclusions logically follow from a well-explained path of data, leaving no "analytical gap"

---

**36.** *See* Eggleston Affidavit, PX 415, at ¶ 181, 182.

**37.** *See* Eggleston Affidavit, PX 415, at ¶¶ 177–78, 183, 184.

between the facts relied upon and the opinion rendered. While Ms. Eggleston's economic assumptions may be challenged at trial with contradictory evidence, and while the Court may ultimately reject Ms. Eggleston's conclusion of insolvency, or reject one, some or all of the valuations of isolated assets or liabilities, the Court finds Ms. Eggleston's testimony is probative and not palpably irrelevant or unreliable, and further finds that her expertise will assist the Court in resolving factual issues, and therefore such testimony may be admitted pursuant to Rules 702 and 703 of the Federal Rules of Evidence and the *Daubert/Kumho* line of decisions.

**SO ORDERED.**